Charles Laurent **FIOCCONI** and Jean Claude Kella, Petitioners-Appellants,

v.

**ATTORNEY GENERAL of the UNITED STATES et al., Respondents-Appellees.**

No. 833, Docket 72–1425.

United States Court of Appeals, Second Circuit.

Argued May 12, 1972.

Decided June 12, 1972.

---

476

Raymond B. Grunewald, Brooklyn (Grunewald, Turk & Gillen, Brooklyn, N. Y., of counsel), for appellants.

Arthur J. Viviani, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S.D.N.Y., Dean C. Rohrer, and Peter F. Rient, Asst. U. S. Attys., of counsel), for appellees.

Before FRIENDLY, Chief Judge, and McGOWAN * and TIMBERS, Circuit Judges.

FRIENDLY, Chief Judge:

Appellants Fiocconi and Kella, citizens of France, were indicted in the District of Massachusetts on November 20, 1969, for conspiring from September 15, 1968, through April 22, 1969, to import heroin into the United States in violation of 21 U.S.C. § 174.[1] Bench warrants were issued but could not be executed. Interpol traced appellants to a town in Italy, where in August 1970 they were arrested by the Italian authorities. A month later the United States Embassy in Rome requested extradition. It acknowledged that narcotics crimes were not among those listed in the Extradition Convention between the two govern-

---

* Of the United States Court of Appeals for the District of Columbia Circuit, sitting by designation.

1. Section 174 was repealed by Pub.L. No. 91–513, tit. III, § 1101(a) (2), 84 Stat. 1291 (1970). By the terms of § 1105(a), the repealer became effective on May 1, 1971. However, the repealer contained a saving provision, § 1103(a), as to prosecutions under § 174 for violations committed prior to May 1, 1971.

ments, 15 Stat. 629 (1868), and subsequent amendments. However, the Embassy expressed its understanding that, independent of the Convention, the Italian Government could grant extradition as an act of comity when the offenses for which this was requested were also crimes under the law of Italy, provided that the relevant treaty did not prohibit extradition for the offenses in question (which the American-Italian Convention did not), and that the offenses with which Fiocconi and Kella had been charged in the United States were in fact crimes under Italian law. Among the papers submitted to the Italian Government were the indictment in and the arrest warrants issued by the District Court for Massachusetts.

After a hearing, a court in Florence directed appellants' extradition "so that they can be subjected to judgment according to the writ of indictment against them formulated by the Grand Jury of the District Court of Appeals of Massachusetts [sic] dated the 20th of November, 1969, and according to the consequent order for arrest on the same date." After unsuccessful appellate proceedings, Fiocconi and Kella were delivered in Italy to United States authorities and were removed to Boston on October 6, 1971. They pleaded not guilty. Bail was fixed in the amount of $250,000 each, which was met by surety bond secured by a $500,000 certified check drawn on a Swiss bank.

Soon after their release on bail, Fiocconi and Kella were subpoenaed to appear before a grand jury in the Southern District of New York. When they appeared, they were arrested on warrants issued under an indictment, returned that day, which charged them with the substantive crime of receiving, concealing, selling and facilitating the transportation, concealment and sale of 37 kilograms of heroin in the Southern

District of New York on or about May 27, 1970. Bail was fixed at $100,000 for each defendant, a sum which they were unable to post. While a habeas corpus petition was pending, the grand jury returned a superseding indictment charging appellants and 21 other defendants with conspiring to violate the narcotics laws from January 1, 1970 through January 4, 1972 [2] and with two substantive offenses in May 1970.[3] Bail was again set at $100,000 each, which Fiocconi and Kella were unable to post. We are advised that the United States has requested Italy to broaden the extradition order to include the New York charges; that Fiocconi and Kella have retained counsel in Italy to resist this; and that no response from the Italian Government has yet been received.

Appellants again petitioned the District Court for the Southern District of New York for release on the ground that their detention there on a charge other than that presented to the Italian Government was an act of bad faith toward the Government of Italy. When the district court denied the petition on March 16, 1972, D.C., 339 F.Supp. 1242, Fiocconi and Kella appealed and later moved for a stay of their trial, which was to commence on May 16. The appeal and motion were heard on May 12; we announced from the bench that, while our reasons differed from those of the district judge, we had concluded to affirm on the basis of our study of the case and the oral argument, with an opinion to be prepared as soon as practicable, and consequently denied the motion for a stay. On May 24 appellants were found guilty.

If the matter were *res nova*, something could be said for the proposition that appellants' claim is not a matter proper for judicial cognizance. The argument would be that since appellants were lawfully arrested in the Southern

---

2. The overt acts extended from May 1970 through October 1971.

3. These were substantially the same crimes charged in the first New York indictment, as to which the Government filed a *nolle prosequi*.

District of New York for an offense allegedly committed there, that should end the matter so far as the courts are concerned; consideration of the effect on this country's international relations of holding appellants for trial on a charge differing from the one presented to the Italian Government should be a matter solely for the executive departments, which can better weigh the relative importance of the conviction of two alleged large scale narcotics violators against possible difficulties in securing future extradition from Italy and other foreign affairs considerations. The position would be that extradition is a matter of treaty or of comity between governments; that a breach of faith by the receiving government entails international consequences; but that the treaty or practice confers no rights on persons who have been so extradited unless this has been spelled out.[4]

■ However, the Supreme Court's decision in United States v. Rauscher, 119 U.S. 407, 7 S.Ct. 234, 30 L.Ed. 425 (1886), of which more hereafter, where Chief Justice Waite made substantially this argument in dissent, 119 U.S. at 434–436, 7 S.Ct. 234,[5] forecloses any such facile escape from appellants' claim. The district judge in this case concluded the normative principle to be that courts would limit United States criminal proceedings to those specially brought to the attention of the foreign government when extradition had been achieved pursuant to a treaty, but that extradition obtained as a result of the exercise of comity was to be treated like a case where the defendant had been brought to this country without aid

from the foreign government. Ker v. Illinois, 119 U.S. 436, 7 S.Ct. 225, 30 L. Ed. 421 (1886), decided on the same day as Rauscher and written by the same Justice, held that where the defendant's removal from the foreign country had been effected extra-legally—in that instance through kidnapping by a federal officer—the defendant could not raise an issue of illegality in his removal unless the language of a treaty with the foreign country whence he had been removed went so far as to support a construction that each country had recognized a right of asylum in the other, including the right of a fugitive to be free from acts of force that would bring him back to the place of his crime.

We think the district court read Rauscher too narrowly. Although the case indeed concerned extradition under a treaty, Mr. Justice Miller began his discussion by considering what the situation would have been without one. He thought it could "hardly be supposed that a government which was under no treaty obligation, nor any absolute obligation of public duty, to seize a person who had found an asylum within its bosom and turn him over to another country for trial, would be willing to do this, unless a case was made of some specific offense of a character which justified the government in depriving the party of his asylum. It is unreasonable that the country of the asylum should be expected to deliver up such person to be dealt with by the demanding government without any limitation, implied or otherwise, upon its prosecution of the party." 119 U.S. at 419, 7 S.Ct. at 240. He went on to observe that the country of

4. As, for example, in the treaty with France quoted in United States ex rel. Donnelly v. Mulligan, 74 F.2d 220, 221 (2 Cir. 1934). See also United States ex rel. Donnelly v. Mulligan, 76 F.2d 511 (2 Cir. 1935).

5. It seems almost certain that Mr. Justice Gray would have joined Chief Justice Waite in this view if the treaty had

stood alone; he concurred since he considered that Rev.Stat. § 5275, now 18 U.S.C. § 3192, see footnote 11, infra, providing for the protection of persons delivered by any foreign government, indicated the intention of Congress to vest extradited persons with a judicial remedy for breach of an extradition treaty by the United States. See 119 U.S. at 433–434, 7 S.Ct. 234.

asylum "might be very willing to deliver up offenders against such laws as were essential to the protection of life, liberty, and person, while it would not be willing to do this on account of minor misdemeanors or of a certain class of political offenses in which it would have no interest or sympathy." *Id.* at 420, 7 S.Ct. at 240. The enumeration of extraditable offenses in treaties was for the very purpose of carrying out "the recognized public law which had prevailed in the absence of treaties." *Id.* Under the Anglo-American Treaty, Rauscher, the second mate of an American vessel, who had been extradited from Great Britain on a charge of murder of a crewman, could not have been so extradited for unlawfully inflicting cruel and unusual punishment on the same man, "an offense for which the treaty made no provision, and which was of a very unimportant character when compared with that of murder." *Id.* at 432, 7 S.Ct. at 247. For the United States to try him for the unextraditable offense was thus a breach of the treaty. Further, and this was the step on which the Justices disagreed, the Court developed a rule of law providing Rauscher

with a judicial remedy for this violation of international law. See ALI, Restatement (Second) of the Foreign Relations Law of the United States § 3(h) (1965).

In light of the analysis leading to Mr. Justice Miller's conclusion, we cannot agree that the basic principle of *Rauscher* is inapplicable where extradition has been obtained as an exercise of comity by the surrendering government.[6] In his view a rule of international law required that the receiving country should not try an extradited person for an offense for which the surrendering country would not have granted extradition; the treaty was important only as clarifying what offenses were or were not extraditable.[7] Rauscher's conviction of an offense for which he was not and could not have been extradited did not violate the treaty, which was silent as to the rights of a person extradited thereunder; it violated a rule of what we would now call United States foreign relations law devised by the courts to implement the treaty. Cf. Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 421–422, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), and cases there cited.[8] We like-

6. Appellants argue that we have already crossed this bridge in United States v. Paroutian, 299 F.2d 486, 490–491 (2 Cir. 1962), since the extradition treaty between the United States and France, which had been extended to Lebanon in 1924 when that country was under French mandate, no longer applied after Lebanon had become independent. However, the United States' request for extradition was made under the treaty, and it is not clear whether the Lebanese Government considered that the treaty was still in effect. In any event, this court's opinion does not focus on the question.

7. It is true that Mr. Justice Miller also discussed the significance of the treaty as a part of the "supreme law of the land, of which courts are bound to take judicial notice of, and to enforce in any appropriate proceeding the rights of persons growing out of that treaty . . . ." 119 U.S. at 417–419, 7 S.Ct. at 240. The absence of a treaty is not dispositive, however, of a court's obligation to

enforce principles of international law which are recognized in our jurisprudence. "International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination." The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). See also, e. g., Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Of course, there is the additional question whether an issue such as here presented which involves the foreign relations of the United States is judicially cognizable, see note 9 *infra*.

8. It is suggested in 2 O'Connell, International Law 805–06 (1965), that if "the rule of specialty" is one of domestic rather than of international law, subsequent consent by the surrendering government should be of no avail. We do not follow this. The rule, as applied in *Rauscher*, partakes of both natures.

wise can see no reason in principle why the judicial remedy fashioned in *Rauscher* should not also apply when extradition has been obtained as an act of comity by the surrendering nation; the need for preserving the United States from a breach of faith is equally strong.[9]

However, the *Rauscher* remedy must be applied in light of the considerations that gave it birth. Since the object of the rule was to prevent the United States from violating international obligations, it becomes essential to determine, as best one can, whether the surrendering state would regard the prosecution at issue as a breach. In *Rauscher* this was altogether clear, in view of the history of negotiations between the two governments in a prior case where Her Majesty's Secretary of State for Foreign Affairs had expressed extreme displeasure over an instance where one Lawrence had been tried for an offense

different from that named in the demand made under the treaty and had refused to honor a subsequent demand for one Winslow unless the United States specifically agreed not to do this, see 119 U.S. at 415–416, 7 S.Ct. 234, 30 L.Ed. 425 and the fact that the offense of which Rauscher was convicted was not in the list of extraditable crimes.[10] The latter was also the case in Cosgrove v. Winney, 174 U.S. 64, 19 S.Ct. 598, 43 L.Ed. 897 (1899), and Johnson v. Browne, 205 U.S. 309, 27 S.Ct. 539, 51 L.Ed. 816 (1907). The *Johnson* opinion, 205 U.S. at 316–317, 27 S.Ct. 539, laid particular emphasis on the Court's doubt whether Canada would have granted extradition if it had been informed what the United States prosecutors evidently intended to do.

In United States v. Paroutian, *supra*, 299 F.2d at 490–491, this court, speaking through Judge Clark, held that

But the rule of domestic law conferring a judicial remedy on the extraditee can be a rule according him the remedy only if the surrendering government would object, since the underlying substantive wrong, which grows out of international law, is only to the latter, see United States ex rel. Donnelly v. Mulligan, *supra*, 76 F.2d at 512–513.

9. In Baker v. Carr, 369 U.S. 186, 211, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Court made clear that not "every case of controversy which touches foreign relations lies beyond judicial cognizance." See also Banco Nacional de Cuba v. Sabbatino, *supra*, 376 U.S. at 422, 84 S.Ct. at 938. There exists, to be sure, a body of case law indicating that the infringement of a foreign nation's sovereignty which results from unlawful seizure and abduction of persons or property from the foreign nation's territory by American agents, is not cognizable in a federal court and does not affect its jurisdiction over the person or property. See, e. g., The Richmond, 13 U.S. (9 Cranch) 102, 3 L.Ed. 670 (1815) (property); The Merino, 22 U.S. (9 Wheat.) 391, 402–403, 6 L.Ed. 118 (1824) (property); United States v. Unverzagt, 299 F. 1015, 1016–1017 (W.D.Wash.1924),

aff'd sub nom. Unverzagt v. Benn, 5 F.2d 492 (9 Cir.), cert. denied, 269 U.S. 566, 46 S.Ct. 24, 70 L.Ed. 415 (1925) (person); United States v. Sobell, 142 F.Supp. 515, 523 (S.D.N.Y.1956), aff'd, 244 F.2d 520 (2 Cir.), cert. denied, 355 U.S. 873, 78 S.Ct. 120, 2 L.Ed.2d 77 (1957) (person); cf. Ker v. Illinois, *supra*, 119 U.S. at 444, 7 S.Ct. 225. However, we deal here not with a violation of territorial sovereignty, but with a possible affront to Italy's sovereignty as a result of an alleged breach of faith with its act of comity. To the extent that there is any question of judicial cognizance of the conduct of our executive branch in the latter situation, this case is controlled by the Court's action in *Rauscher*.

10. As Chief Justice Taft said in Ford v. United States, 273 U.S. 593, 615, 47 S.Ct. 531, 538, 71 L.Ed. 793 (1927), "the enumeration of the offenses in the treaty . . . involved [in *Rauscher*] marked such a clear line in regard to the magnitude and importance of those offenses that it was impossible to give any other interpretation to it than the exclusion of the right of extradition in others . . . ."

"the test whether trial is for a 'separate offense' should be not some technical refinement of local law, but whether the extraditing country would consider the offense actually tried 'separate,'" and went on to express disbelief "that the Lebanese, fully apprised of the facts as they were, would consider that Paroutian was tried for anything else but the offense for which he was extradited, namely, trafficking in narcotics." The letter requesting Paroutian's extradition had attached an indictment dated February 25, 1959, in the Southern District of New York, accusing Paroutian of a conspiracy to violate 21 U.S.C. § 174. He was tried and convicted on an indictment in the Eastern District of New York, filed after the warrant of extradition issued, which included in addition counts for receipt and concealment of heroin not covered by the indictment sent to Lebanon. Admittedly, the instant case requires us to go a step further in that the superseding indictment in New York charged narcotics offenses subsequent to those in the Massachusetts indictment. Still, in the absence of any affirmative protest from Italy, we do not believe that Government would regard the prosecution of Fiocconi and Kella for subsequent offenses of the same character as the crime for which they were extradited as a breach .of faith by the United States.

■ The "principle of specialty" reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government, especially for political crimes. Cf. United States v. Rauscher, *supra*, 119 U.S. at 419–420, 7 S.Ct. 234; 1 Oppenheim, International Law 702 (Lauterpacht 8th ed. 1955); Bishop, International Law 573–74 (3d ed. 1971). It is hard to believe that Italy would have objected if a superseding indictment including later narcotics offenses had been filed in Massachusetts. We assume that course would have been followed except

for problems of venue, a "technical refinement of local law," with which Italy is scarcely concerned. To be sure, the United States has not made a preliminary showing in Italy with respect to the New York indictment as it did concerning the Massachusetts one, cf. United States v. Rauscher, *supra*, 119 U.S. at 422–423, 7 S.Ct. 234. However, we presume the United States is willing to submit such proof if Italy desires it and, with appellants now having been found guilty, there can scarcely be doubt that sufficient proof to warrant extradition exists.

Our conclusion is somewhat fortified by Art. III of the Extradition Convention between the United States and Italy, 15 Stat. 631 (1868), which provides that "the person . . . delivered up for the crimes enumerated . . . shall in no case be tried for any . . . crime, committed previously to that for which his . . . surrender is asked." If the countries had intended that the requesting government could not try the accused for any crime committed before the time of his surrender other than the crime for which he was extradited, they could have accomplished this by adopting one of the standard clauses to that end. See 1 J. Moore, Extradition §§ 148–49, at 194–96 (1891). Compare Collins v. O'Neil, 214 U.S. 113, 122–123, 29 S.Ct. 573, 53 L.Ed. 933 (1909). The special provision in this treaty could well be read as an acquiescence in trial for crimes before surrender, at least if of the same general nature, provided only that they were not antecedent to that for which the surrender was asked. If narcotics offenses had been included in the Convention, it would thus be fairly arguable that, by virtue of the quoted provision, appellant could be prosecuted under the New York indictment, quite apart from the analysis made above. Although we are here concerned with a crime not within the Extradition Convention, Article III provides some indication of the limits of It-

aly's concern with the prosecution of persons whom it surrenders to the United States and of the conditions upon which extradition between the two countries normally occurs. Thus, we think the article bolsters our conclusion that Italy would not consider the actions of the United States to be a breach of faith with its acts of comity.

No different conclusion is called for by 18 U.S.C. § 3192.[11] Despite the narrower phrase used in the statute, we read the references to a predecessor act in *Rauscher*, 119 U.S. at 423, 7 S.Ct. 234, and also in Cosgrove v. Winney, *supra*, 174 U.S. at 67, 19 S.Ct. 598, and Johnson v. Browne, *supra*, 205 U.S. at 317–318, 27 S.Ct. 539, as considering the statute to be merely congressional recognition of the principle that a person who has been extradited should not be tried for an offense which the foreign country would consider to be outside the limits of its act of extradition. As shown, so broad a principle does not aid these appellants.

We therefore affirm the district court's denial of the writ.[12] While such affirmance will not preclude Fiocconi and Kella from again raising the point on an appeal from their convictions, this opinion will constitute the law of the case as far as this court is concerned, see Zdanok v. Glidden Co., 327 F.2d 944, 949–953 (2 Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964), in the absence of any new developments, of fact or of law, that would call for a different conclusion.

11. Whenever any person is delivered by any foreign government to an agent of the United States, for the purpose of being brought within the United States and tried for any offense of which he is duly accused, the President shall have power to take all necessary measures for the transportation and safekeeping of such accused person, and for his security against lawless violence, *until the final conclusion of his trial for the offenses specified in the warrant of extradition,* and until his final discharge from custody or imprisonment for or on account of such offenses, and for a reasonable time thereafter, and may employ such portion of the land or naval forces of the United States, or of the militia thereof, as may be necessary for the safe-keeping and protection of the accused. (Emphasis supplied)

12. In order to remove any doubt as to the running of periods for review, we vacate our oral order and direct that this opinion constitute the judgment of the court.