**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Steven Warren KAUFMAN, a/k/a John Rayford, Leonard Joseph Kissell, James Gregory Smith, Perry Franks and Paddy D. Franks, Defendants–Appellants.**

No. 87–1462.

United States Court of Appeals, Fifth Circuit.

Oct. 17, 1988.

Ronald G. Guyer, San Antonio, Tex. (court-appointed), for Steve W. Kaufman.

Martha Dickey, Austin, Tex. (court-appointed), for James Gregory Smith.

Michael E. Tigar, Austin, Tex. (court-appointed), for Perry Franks & Paddy D. Franks.

Charles O. Grigson, San Antonio, Austin, Tex. (court-appointed), for Kissell.

Helen M. Eversberg, LeRoy Morgan Jahn, Asst. U.S. Atty., San Antonio, Tex., Louis M. Fischer, Appellate Sect., Crim. Div., Washington, D.C., James H. DeAtley, Asst. U.S. Atty., Austin, Tex., for plaintiff-appellee.

Before KING, JOHNSON and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

This consolidated appeal concerns five of fourteen individuals indicted for attempting to bring marijuana into the United States. The appellants raise numerous objections to their drug-possession and conspiracy convictions, including, *inter alia*, assertions that the evidence was insufficient to support certain convictions, that certain evidence was inadmissible, and that the trials of some of the defendants should have been severed. In addition, Perry and Paddy Franks challenge their extradition from Mexico. We uphold the jury's conviction of the defendants on all counts.

I

The Facts

The drug conspiracy began in March 1986 when Wayne McClenney, James Smith and other individuals not involved in this appeal met on several occasions to discuss the scheme. The plan began to materialize when Chris Fithian bought a Piper Navajo airplane for the purpose of transporting marijuana from Belize to the Midland–Odessa, Texas area. McClenney was told that the Franks brothers would be supplying the marijuana from Belize. McClenney then contacted the DEA, and in April 1986, the DEA initiated an investigation, using agent Larry Lamberson as its undercover operative. Lamberson posed as a provider of clandestine airfields and support servic-

es and met with Smith on April 25. Smith agreed to pay Lamberson $10,000 for each load of marijuana flown into Lamberson's clandestine airfield. On May 1, Smith introduced Lamberson to another co-conspirator, Gilbert Perez, at an Austin restaurant. Perez renegotiated the arrangement with Lamberson, agreeing to pay him with both cocaine and money.

On May 2, McClenney and Smith traveled to Chetumal, Mexico, to meet the Franks brothers and secure appropriate landing sites for the Piper Navajo. Smith and McClenney met the Franks brothers and discussed the details of the Belizean marijuana operation. The Franks brothers also helped Smith and McClenney obtain possession of the Piper Navajo at Chetumal airport. McClenney and Smith then flew the plane to the United States.

On May 21, agent Lamberson and informant McClenney met another co-conspirator, Leonard Kissell. Kissell gave McClenney money to make repairs on the plane and told McClenney how to avoid radar detection when smuggling the marijuana. On the afternoon of June 16, Lamberson, McClenney, Smith, Perez, and Douglas Costa met to discuss their plans. Costa stated that he owned the plane and because Fithian had been hurt in a car accident, Costa would control the smuggling operation. On June 17 Lamberson and McClenney had lunch with Perez and Costa. Perez said he had sent Smith to Belize so that Smith could check on the marijuana supply. Costa then asked whether Lamberson could also supply marijuana in case the Franks brothers were unable to provide it. Lamberson informed Costa that he could supply Mexican marijuana if the Franks brothers did not complete their part of the deal. Smith returned from Belize on June 27 and advised Lamberson that Kissell and the Franks brothers had been unable to obtain a full load of marijuana. Because of the failure to obtain marijuana from Belize, Costa attempted on several occasions to buy marijuana from Lamberson. Several meetings were held, at which Costa offered to pay Lamberson either in cash or cocaine for marijuana purportedly shipped from Mexico. On June 30, Costa and Smith met Lamberson again and paid him nine kilograms of cocaine to deliver marijuana.

The next morning, July 1, DEA agents loaded approximately 800 lbs. of marijuana into a twin-engine plane and flew to Lamberson's airstrip. On the same morning, Lamberson delivered two canvas bags containing sample bales of marijuana to Costa's motel room. Costa stated that he would deliver the bags to his buyers. He then drove across the street where he met with Kaufman and other conspirators. After they looked inside the bags for several minutes, they put them into Kaufman's car and Kaufman drove away. Lamberson, Smith and Costa then drove to the airstrip to meet the planeload of marijuana scheduled to arrive at 1 p.m. Smith signalled the plane to land and assisted in its unloading. Costa then drove a pickup truck loaded with the marijuana to an Austin warehouse where he weighed the marijuana and attempted to pay Lamberson for additional services. Kaufman drove around the warehouse several times in an apparent attempt at counter-surveillance. All parties, except for the Franks brothers, were then arrested and indicted in the Western District of Texas on July 15, 1986.

Paddy Franks and Perry Franks were arrested on July 22, 1986, by DEA agents in Chetumal, Mexico, for a Louisiana indictment relating to another drug-importation conspiracy. The arrests were made only on the basis of the Louisiana indictment and arrest warrants, even though the Frankses had been indicted on July 15 in Texas on the instant charges. After taking custody of the Franks brothers, the DEA agents flew them out of Mexico on a commercial flight on which Mexican authorities had placed them. The Louisiana charges were dismissed against Paddy Franks on September 4, and Perry Franks was convicted. On October 21, an indictment superseding the July 15 indictment on the instant charges was handed down against the Franks brothers. The brothers were then transferred from Louisiana to the custody of Sheriff Jack Harwell in Texas, and various hearings followed. The Franks brothers petitioned for habeas relief, con-

tending that their trial on the Texas charges, when they had been extradited solely on the Louisiana charges, would violate the United States–Mexican extradition treaty and therefore deprive the court of jurisdiction. Their petition was denied by the district court.

After a jury trial in district court, appellants Kissell, Smith, Perry Franks and Paddy Franks were convicted of conspiring to import more than fifty kilograms of marijuana into the United States. Kaufman and Smith were convicted of conspiring to possess more than fifty kilograms of marijuana with intent to distribute. Kaufman was also convicted on two substantive marijuana possession counts, and Smith on one such count. Finally, Smith was convicted on one count of distributing more than one kilogram of cocaine.[1] The defendants appeal.

## II

### The Sufficiency of the Evidence

Only three defendants challenge the sufficiency of the evidence against them— Kaufman, Kissell and Smith. The question on appeal is whether there is substantial evidence, viewed in the light most favorable to the government, to uphold a jury's guilty verdict. *United States v. Alvarado Garcia*, 781 F.2d 422, 423 (5th Cir.1986) (citing *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) and *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942)). Put another way, the question is whether a reasonable jury could have found beyond a reasonable doubt that the defendants committed the offenses. *United States v. Walker*, 720 F.2d 1527, 1538 (11th Cir. 1983).

### A.

### Kaufman

■ Kaufman contends that the evidence does not support his conviction on the Count II conspiracy charge or the two possession charges. In examining Kauf-

man's conviction for conspiracy to possess marijuana, we begin with the premise that the government must prove (1) a conspiracy existed, (2) the defendant knew of the conspiracy, and (3) the defendant voluntarily participated in the conspiracy. *See United States v. Littrell*, 574 F.2d 828, 832 (5th Cir.1978). A defendant's knowledge of the conspiracy and his participation in the conspiracy can be inferred from circumstances. *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir.1982). "A conviction will not be reversed for lack of evidence that the defendant was acquainted with or knew all of the coconspirators, or lack of evidence that he knew each detail of the conspiracy, or because he became a member of the conspiracy after its inception, or played only a minor role in the overall scheme." *Id.* (citations omitted).

■ The existence of a conspiracy to possess marijuana is not in doubt here. Moreover, the record contains convincing evidence, circumstantial to be sure, that Kaufman was involved in the conspiracy. A reasonable view of the evidence shows that on several occasions, including the day agent Lamberson delivered the marijuana to Costa, Kaufman made his house available as a meeting place for members of the conspiracy and was present when the other conspirators arrived and entered. Furthermore, on the morning of July, 1, after Lamberson had delivered the marijuana to Costa, Costa proceeded across the street from his motel and met individually with Kaufman and others immediately after telling Lamberson that he was about to deliver the samples to his "buyers." According to government agents, Kaufman and the other buyers gathered around the two bags of marijuana in the back of Costa's pickup and made motions indicating that they were opening the bags and examining the contents. Then, by a circuitous route, Kaufman drove away with the marijuana bags in his car. After Kaufman drove away, Costa met with agent Lamberson again and told him that the buyers—apparently including Kaufman—wanted to go

---

1. Although indicted, Kissell and the Franks brothers were acquitted by the district court on the charge of conspiring to possess more than fifty kilograms of marijuana.

ahead with the deal. That afternoon, after going to a bank, Kaufman proceeded to the parking lot to which Costa had brought Lamberson's delivery of marijuana and met again with Costa and other conspirators. Shortly thereafter, Kaufman followed Costa's pickup loaded with marijuana to a warehouse where the marijuana was to be weighed and distributed to the buyers. Although Kaufman did not enter the warehouse, he drove up and down the highway adjacent to the warehouse in what could be reasonably viewed as an attempt to conduct counter-surveillance.

Thus, the circumstantial evidence is strong that Kaufman knew of the conspiracy and voluntarily participated in it as a buyer of the marijuana that agent Lamberson supplied Costa. Although Kaufman argues that he had no knowledge of the conspiracy and lacked intent to possess the marijuana, we conclude that a reasonable jury could infer beyond a reasonable doubt that Kaufman conspired to possess marijuana.

■ Kaufman fares no better in his efforts to attack his two convictions for possession. In order to prove possession with intent to distribute, the government must establish that Kaufman had knowledge, possession of a controlled substance, and a specific intent to distribute it. 28 U.S.C. § 841(a)(1). Possession need not be actual but may be constructive. *United States v. Ledezma–Hernandez,* 729 F.2d 310, 314 (5th Cir.1984); *United States v. Vergara,* 687 F.2d 57, 61 (5th Cir.1982). Constructive possession is " 'the knowing exercise of, or the knowing power or right to exercise dominion and control over the proscribed substance.' " *United States v. Glasgow,* 658 F.2d 1036, 1043 (5th Cir.1981) (quoting *United States v. Marx,* 635 F.2d 436, 440 (5th Cir.1981)).

■ With regard to Count VI—the charge of possession of approximately seven kilograms of marijuana with intent to distribute—the case against Kaufman is clear. The evidence indicates that Kaufman examined the contents of two canvas bags, each containing a bale of marijuana, before placing them in his BMW automobile. Moreover, even if Kaufman did not actually open the bags, the fact that he met with members of the conspiracy the night before and the morning of his transportation of the bags in his car, strongly suggests Kaufman knew what was inside them. Furthermore, his conduct after transporting the bales—circuitous driving, contracts with other buyers, etc.—indicates guilty knowledge. Thus, a reasonable jury could have inferred the first element: knowledge. Similarly, the jury could have inferred the second element: possession. One who owns or exercises dominion or control over a motor vehicle in which a contraband substance is concealed may be deemed to possess the contraband. *United States v. Moreno–Hinojosa,* 804 F.2d 845, 847 (5th Cir.1986); *United States v. Tolliver,* 780 F.2d 1177, 1183 (5th Cir.1986) *vacated on other grounds,* 479 U.S. 1074, 107 S.Ct. 1267, 94 L.Ed.2d 128 (1987); *United States v. Riggins,* 563 F.2d 1264 (5th Cir. 1977), *cert. denied,* 439 U.S. 848, 99 S.Ct. 148, 58 L.Ed.2d 150 (1978). Since there is no dispute about Kaufman's ownership or control of the car in which he was transporting the marijuana samples, the jury reasonably concluded that the marijuana was in Kaufman's possession. The jury also had substantial evidence to satisfy the third and final element: intent to distribute. Each of the canvas bags in Kaufman's car contained a bale of marijuana weighing almost ten pounds, a larger quantity than an ordinary user would possess for personal consumption. Thus, the jury reasonably concluded that Kaufman was guilty as charged in Count VI.

■ With regard to Count VII, the case against Kaufman is also persuasive. Count VII charges Kaufman with possession with intent to distribute more than fifty kilograms of marijuana. The record shows that on July 1, after Kaufman drove away with the two canvas bags of marijuana, Costa, the ringleader, drove with some co-conspirators to the airstrip to meet the plane loaded with marijuana. After the plane was unloaded, Costa drove a pickup containing the cargo into Austin, where Kaufman and the other buyers met him.

Kaufman and the other buyers then followed Costa to an Austin warehouse. Driving up and down the highway and twice stopping to patrol on foot in order to disrupt any surveillance by the police, Kaufman acted as a lookout while the marijuana was being transferred at the warehouse. It may be true, as Kaufman contends, that he never touched the marijuana; nonetheless, possession may be actual or constructive, may be joint among several defendants, and may be proved by circumstantial as well as direct evidence. *Vergara*, 687 F.2d at 61. Here, the evidence strongly supports the conclusion that Kaufman was part of a group of individuals having joint possession of the fifty kilograms of marijuana, and the jury reasonably could have inferred that he shared control and dominion over the marijuana given the evidence that the group acted in concert. Thus, the jury was reasonable in its conclusion that Kaufman was also guilty of possession under Count VII.

### B.

### Kissell

■ Kissell contends that the evidence was insufficient to convict him of engaging in a conspiracy to import more than fifty kilograms of marijuana from Belize. His conviction for conspiracy is unwarranted, Kissell argues, because the evidence indicates he conspired only with the two government agents, McClenney and Lamberson. The only other persons he knew who were implicated in the conspiracy, he argues, were Fithian and the Franks brothers, and the evidence was insufficient to show that Kissell had entered into an agreement with them to import marijuana from Belize. Finally, Kissell contends that his only act was to pay the repair bill for the airplane as directed by Fithian.

It is uncontestable on this record that a conspiracy to smuggle marijuana into the United States by air existed. Moreover, Kissell knew about it. When he met with Lamberson and McClenney on May 21, 1986, Kissell revealed that Fithian was behind the conspiracy and that he, Kissell, was supplying money from Fithian for the repairs necessary to render the airplane operational. Indeed, Kissell explained his own role in the enterprise as something akin to that of a trouble-shooter for Fithian. Furthermore, the record contains evidence that Kissell voluntarily participated in the scheme by instructing Lamberson and McClenney how to detect transponders which might be placed in the airplane by law enforcement personnel, and by describing how he himself had avoided detection when flying marijuana into the country for the Franks brothers. In addition, several members of the conspiracy, in an ongoing effort to reassure Lamberson and McClenney and to keep them apprised of developments, reported to them that Kissell had made a trip to Belize to smooth the way for the Frankses to begin flying out the marijuana. It is well settled that these statements were admissible against Kissell as a co-conspirator's admission against another co-conspirator in the course and in furtherance of a conspiracy. Fed.R.Evid. 801(d)(2)(E). *See also Wong Sun v. United States*, 371 U.S. 471, 490, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963). On the strength of the foregoing evidence, a jury could reasonably find that Kissell had participated in the conspiracy.

### C.

### Smith

Finally, Smith challenges the sufficiency of the evidence only on Count IV, aiding and abetting Costa's distribution of nine kilos of cocaine on the night before Lamberson provided the marijuana. Smith contends that he did nothing to aid Costa's distribution and was merely present at the meeting. The government contends that not only did Smith have a vital interest in the cocaine distribution because it was intended to further the marijuana conspiracy, but he also helped cement the cocaine distribution deal by offering and snorting the cocaine, seconding Costa's argument that Lamberson should immediately provide two bales of marijuana as samples in exchange for the nine kilograms of cocaine, haggling with Lamberson over the price of the mari-

juana, and offering to fly McClenney to Mexico to pick up the marijuana load.

■■■■■ A conviction for aiding and abetting requires the government to show that the defendant engaged in some affirmative conduct to ensure that a criminal venture would succeed. *United States v. Colwell*, 764 F.2d 1070, 1072 (5th Cir.1985). In *United States v. Martinez*, 555 F.2d 1269, 1279 (5th Cir.1977), we held that acting as a lookout during a distribution constituted aiding and abetting. Here Smith accompanied Costa during the distribution and wholeheartedly supported him with efforts to advance the transaction. Smith urged that Lamberson accept the cocaine as an earnest payment on the marijuana he and Costa hoped to secure from Lamberson. In addition, Smith argued that the delivery obliged Lamberson to deliver some sample marijuana bales to Costa in return. We believe that if acting as a paid lookout was affirmative enough to constitute aiding and abetting in *Martinez*, advancing self-interests by affirmative support of the cocaine transaction by Smith is enough to constitute aiding and abetting in the instant case. We therefore affirm the jury's conviction of Smith for aiding and abetting.

### III

#### Smith's Due Process Contention

■■■■ Smith also contends that the government's involvement in the alleged smuggling operation was so pervasive that it constituted overreaching and outrageous conduct in violation of Smith's due process rights. He contends that the government was actually the principal conspirator in this case and that without the government managing the logistics, including the supply of marijuana, no crime would have been committed.

This argument is not a winner for Smith. First, it is well settled in the Fifth Circuit that the "outrageous government conduct" defense can only be asserted in the most outrageous circumstances, *United States v. Arteaga*, 807 F.2d 424, 426 (5th Cir. 1986), and this case does not meet that standard. Moreover, a defendant may not avail himself of this defense when he was an active participant in the crime at issue. *United States v. Toro*, 840 F.2d 1221, 1235 (5th Cir.1988); *United States v. Miller*, 799 F.2d 985, 988 (5th Cir.1986). In this case, Smith was a major conspirator in the marijuana importation scheme. Smith originally approached McClenney to fly the plane from Belize to the United States and also arranged for McClenney and Lamberson to meet Costa on various occasions. Further, Smith actually helped load the marijuana into the pickup truck that was later driven to Austin. We therefore conclude that under *Toro* and *Miller* Smith is barred from asserting this defense.

### IV

#### Kissell and the Franks Brothers' Misjoinder Argument

Kissell and the Franks brothers contend that they were prejudiced by joinder of Counts I and II in the indictment. Count I involved conspiring to import more than fifty kilograms of marijuana (Belize conspiracy). Count II involved conspiring to possess marijuana with intent to distribute (Mexican conspiracy). The trial court acquitted Kissell and the Franks brothers of Count II at the close of the evidence, and they argue that no evidence suggests their involvement in the Mexican conspiracy. Their activities, they contend, were confined solely to locating and importing marijuana from Belize. They assert that the prosecution either acted in bad faith or used a wrong legal theory—that there was a single overall conspiracy—to introduce at trial much harmful evidence involving Count II and thereby unfairly prejudice them before the jury.

The government asserts that the Rule 8(b) joinder of Counts I and II did not constitute prosecutorial misconduct because there was no bad faith and no unfair prejudice. At the time of the indictment, the telling time for this purpose, *United States v. Harrelson*, 754 F.2d 1153, 1176–77 (5th Cir.), *cert. denied*, 474 U.S. 908, 106 S.Ct. 277, 88 L.Ed.2d 241 (1985), there was evidence of a link between the two conspiracies. The evidence included a statement

by Costa, the ringleader, to Lamberson that the profits from the Mexican conspiracy would have to be divided among all the conspirators, including the Belize conspirators, because it was a "company deal." In addition, Kissell, the troubleshooter for the Belize conspiracy, paid for the repairs of the airplane that delivered the marijuana in the Mexican conspiracy; and Costa, Smith and Perez were active participants in both conspiracies. Moreover, the government argues, the conspiracies were inextricably tied together in that the Belize conspiracy was always primary and the Mexican was merely the backup plan in case at the last minute the Belize shipment failed to materialize. Finally, the government supports its argument by citing the general proposition that all defendants indicted together should be tried together. *United States v. Toro*, 840 F.2d 1221, 1238 (5th Cir.1988).

The propriety of Rule 8 joinder is determined by the initial allegations of the indictment, which, barring arguments of prosecutorial misconduct, are accepted as true. *United States v. Harrelson*, 754 F.2d 1153, 1776 (5th Cir.1985) (citations omitted). Since this case involves multiple defendants as well as multiple counts, Rule 8(b), Fed.R.Crim.P., provides the relevant standard. *United States v. Lane*, 735 F.2d 799, 804 (5th Cir.1984). Rule 8(b) provides that defendants may be charged in the same indictment if they are alleged to have participated "in the same series of acts or transactions constituting an offense or offenses," and that "all of the defendants need not be charged in each count." Joinder of defendants is proper under Rule 8(b) where the record, examined broadly, presents two conspiracies substantially interrelated by their facts and participants rather than two separate and distinct conspiracies. *Toro*, 840 F.2d at 1238.

There is no doubt that Kissell and the Franks brothers engaged in trafficking drugs for the "company." The fact that Kaufman and the Franks brothers were acquitted on Count II does not mean that there was no evidence to connect them with the Mexican conspiracy and that there was prosecutorial bad faith or Rule 8(b) misjoin-

der. In fact, the grand jury could have viewed the transactions involved in this case as a general conspiracy to import and profit from the trafficking of marijuana. The evidence sufficiently establishes that Count II, or Mexican, conspiracy was in the nature of a contingency plan whereby the "company" could supply its customers when the Belize supply line failed to deliver the goods. It was developed as a means of completing the object of the original conspiracy. In short, both the Belize and Mexican operations can be viewed as a single overarching conspiracy and could have been charged as such. Thus, we hold that there is no misjoinder under Rule 8(b).

Kissell also argues that his indictment on Count II was at variance with the evidence introduced at trial. He states that since there was no evidence supporting the indictment for Count II, the joinder of Count II was highly prejudicial. The foregoing discussion answers this argument by Kissell, which is meritless.

## V

### The Denial of the Motion for Severance

At trial, Kaufman, Kissell and the Franks brothers filed a motion for severance under Fed.R.Crim.P. 14, contending that much of the evidence introduced at trial was irrelevant and so highly prejudicial to their case as to undermine their right to a fair trial. We review denial of a Rule 14 motion only for abuse of discretion. *Toro*, 840 F.2d at 1238; *Harrelson*, 754 F.2d at 1177. The appellants must show that they "suffered specific and compelling prejudice against which the trial court was unable to afford protection, and that this prejudice resulted in an unfair trial." *Toro*, 840 F.2d at 1238.

The defendants' primary objection to the denial of the motion is that Costa and Smith's use of an entrapment defense at trial prejudiced their claims of innocence. Kaufman in particular contends that the entrapment defense was tantamount to admitting guilt, and that the use of this defense by other defendants impaired his ability to receive a fair trial. In *Toro* we

rejected an argument similar to Kaufman's. Further, we said that there was nothing inherently antagonistic between one defendant's claim of entrapment and another's simple denial of guilt. *Toro,* 840 F.2d at 1238–39. We stated that "[t]o justify severance ... the defenses must be more than merely antagonistic; they must be irreconcilable and mutually exclusive." *Id.* (citation omitted). Such is not the case here. Simply because in their entrapment defense Costa and Smith may have admitted being part of a conspiracy, it does not follow that the jury would have been required to exclude the defense of Kissell and the Franks brothers that they were not part of that conspiracy. Hence, under *Toro,* 840 F.2d 1221, we hold that the district court did not abuse its discretion in denying the motion for severance.

Kaufman, Russell and the Franks brothers also object to the "spillover" evidence concerning Count II which, they maintain, influenced the jury verdict in Count I. We find, however, that the jurors could have segregated the evidence pertaining to Count I from that pertaining to Count II and were instructed by the judge to do so. Hence there was no unfair prejudice that would compel us to disturb the jury's verdict. Moreover, we believe that it would be a serious mistake, certainly on the arguments made here, to second-guess judgments that the district court had the opportunity to make firsthand. We therefore affirm the denial of severance.

## VI

### The Validity of the Warrant to Search Kaufman's Residence

 Kaufman argues that the trial court erred in failing to suppress evidence obtained in a search of his residence. The warrant was invalid, he asserts, because it was based in part on an affidavit containing false statements, the absence of which would have deprived it of probable cause. Agent Lamberson's affidavit stated that the police had observed Kaufman's house for several days prior to July 1, and based on their observation of the transfer of marijuana into a red BMW that was eventually

parked there, believed that his house served as a center for drug operations. On appeal, Kaufman contends that the agents knew the marijuana had been taken out of the car before it was parked at Kaufman's residence. Thus, he asserts, the affidavit contained at least one knowingly false statement, rendering the warrant illegal.

We can quickly reject Kaufman's argument. Aside from his baseless allegations of bad faith on the part of the police, the point he raises is essentially insignificant in the light of all the other evidence that supported the warrant. The same red BMW that had been observed transporting marijuana was parked at Kaufman's residence, where the police had observed the other conspirators meeting on a regular basis. That Kaufman was a member of the conspiracy and that his house was a crucial focal point of the conspiracy is a reasonable inference from the facts alleged in the affidavit, and was sufficient to show that there was probable cause to believe that critical and incriminating evidence could be located in the dwelling. In any event, the introduction of the evidence taken from Kaufman's residence (several false identifications containing Kaufman's photograph), even if unlawfully seized, was harmless error since the evidence against Kaufman unrelated to the search was far more incriminating and indeed overwhelming.

## VII

### The Admissibility of Informant McClenney's Testimony

 The appellants next argue that the district court committed plain error in permitting informant Wayne McClenney to testify at trial because McClenney was paid by the government for information and was told that the amount of his reward was contingent upon the quality of his information. Agent Braziel apparently advised McClenney that he was entitled to an award up to $150,000 from the asset-forfeiture fund of the federal government. Further, the appellants allege—and the government denies—that the government withheld a final decision as to the amount

of McClenney's award until after the trial. McClenney's testimony was so heavily biased, according to the appellants, that the district court committed plain error in refusing to strike it. *See United States v. Lacoste,* 721 F.2d 984 (5th Cir.1984).

In addition, the appellants attempt to distinguish *United States v. Cervantes–Pacheco,* 826 F.2d 310, 315 (5th Cir.1987) (en banc) (allowing a contingent-fee witness to testify), by contending that in the instant case, unlike *Cervantes–Pacheco,* the informant was clearly falsifying his testimony. In *Cervantes–Pacheco,* 826 F.2d at 315, this court refused to adopt "a per se rule that disqualifies a compensated informer from testifying as a witness." We held that it is up to the jury to evaluate the credibility of the compensated witness just as it does that of any other witness. Our decision in *Cervantes–Pacheco* controls here. The trial judge in the instant case instructed the jury that McClenney was being paid by the government as we required in *Cervantes–Pacheco,* 826 F.2d at 316. Thus, the jury was on notice of the informant-witness's fee arrangement and in that light evaluated his credibility as it saw fit. We hold, therefore, that the trial court did not err in admitting McClenney's testimony.

### VIII

#### Kissell's Prior Conviction

■ Kissell contends that the district court abused its discretion in admitting into evidence his prior conviction for drug possession in order to show his intent in the drug conspiracy. He had previously been convicted for possession of between five and fifty pounds of marijuana. According to Kissell, the conviction was used to show his character rather than the intent of his actions in this case and, therefore, any probative value of the conviction was outweighed by the prejudice to him, in violation of Fed.R.Evid. 403. He also asserts that his prior conviction was dissimilar to the instant conspiracy charges and thus should not be admissible.

Again, we can quickly reject this contention. Kissell's claim of innocence in this case clearly placed his intent in issue, and certainly the district court did not abuse its discretion in admitting this evidence under Rule 404(b), Fed.R.Evid. Furthermore, the court plainly instructed the jury that the prior conviction could be used only to determine the defendant's intent. Finally, Kissell's earlier conviction for possession of marijuana was certainly similar enough to the charge of importing marijuana in the instant case to shed light on Kissell's intent. Plainly, the district court did not err.

### IX

#### The Denial of Discovery to Smith and Kissell

■ Smith and Kissell contend that the district court erred when it refused to allow them to discover evidence regarding the government's post-indictment investigation of an attempt by the Franks brothers to have McClenney killed. This argument is without merit. The government did not use any evidence from this investigation at trial. *See Maine v. Moulton,* 474 U.S. 159, 178–80, 106 S.Ct. 477, 488–90, 88 L.Ed.2d 481 (1985). The trial court correctly determined that the evidence the defendants sought was not relevant to their case and properly denied the motions for discovery.

### X

#### Prosecution's Comment on Kaufman's Silence

■ Kaufman argues that his conviction should be reversed because the prosecutor's closing argument included a reference to his silence at trial. At the close of the trial, the prosecutor stated to the jury that several of the defendants, including "that quiet man back there, Kaufman," took several bags of marijuana in the drug deal and examined them. Kaufman's defense counsel objected to the prosecutor's statement and argued that the prosecutor had referred to Kaufman's failure to testify. The trial judge denied the appellant's mistrial motion and concluded that the prosecutor's statement did not refer to Kaufman's failure to testify. In addition,

the trial court instructed the jury to decide the case only on the evidence and not on the arguments of counsel. We hold that the trial court did not abuse its discretion in denying the motion for mistrial on this basis. The trial judge was in a far better position than we are to determine whether the prosecutor's comment, under the existing circumstances, could be deemed a reference to the defendant's failure to testify. We will not overturn his judgment.

## XI

### Smith's Claim of Ineffective Assistance of Counsel

 Smith asserts that he suffered ineffective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He cites three grounds for his claim of ineffective assistance of counsel: that his lawyer was insufficiently prepared at trial; failed to object to McClenney's testimony; and failed to request a jury instruction concerning Smith's failure to testify.

Smith's contentions are meritless. Admittedly, his counsel had only a month to prepare for trial because Smith himself objected to his prior attorney and requested that he be replaced. But Smith does not give examples of how his trial attorney was insufficiently prepared. Second, the two other errors Smith cites are hardly the type that survive the test of *Strickland v. Washington*, i.e., that his attorney was deficient and the deficiencies altered the outcome of the case. 466 U.S. at 686, 104 S.Ct. at 2063.

## XII

### Appellants' Contention that Venue was Wrongly Changed

 The appellants argue that the trial court abused its discretion in holding trial in the Waco rather than in the Austin division of the Western District of Texas. They note that if the trial had been held in Austin, the defendants would have had access in their jail to a library and that, in addition, the various defense attorneys would not have suffered hardship in attending trial.

The parties clearly suffered only minor inconvenience in having to attend trial in Waco rather than Austin. This court has held that travel and lodging expenses for lawyers and witnesses do not constitute prejudice sufficient to overcome a district court's determination regarding the place of trial. *United States v. Fagan*, 821 F.2d 1002, 1008 (5th Cir.1987). In addition, under Rule 18, Fed.R.Crim.P., the district court has broad discretion in determining whether a trial should be transferred within a district. *United States v. Weddell*, 800 F.2d 1404, 1406 (5th Cir.1986). In the instant case, the district court clearly had a valid reason for changing venue. Specifically, the trial court found that if it held trial in Austin, then the district court's docket in Waco would have to be completely ignored. In the best interests of judicial economy and efficiency, the district court held that the trial should be conducted in Waco, and in so holding did not abuse its discretion.

## XIII

### The Franks Brothers' Extradition Argument

The Franks brothers were arrested in Chetumal, Mexico, on July 24, 1986, by DEA agents and Mexican federal judicial police, and were then flown by commercial airliner from Mexico to the United States. They were taken first to Louisiana where they had been indicted in January 1986 for participating in a drug conspiracy. The Louisiana charges against Paddy Franks were dismissed and Perry Franks was convicted after a trial. Afterwards, both brothers were transferred to Texas to be tried in the instant case pursuant to the indictment of July 1986.

In Texas the Franks brothers petitioned for habeas relief, contending that they were entitled to an evidentiary hearing to show that their removal from Mexico was an extradition and therefore the government was bound to proceed in accordance with the United States–Mexican extradition treaty. Once having proved they were ex-

tradited, they could also show—they maintain—that their detention and trial on the Texas indictment were in violation of article 17 of the treaty,[2] which embodies the international law "rule of specialty." Article 17, they argue, must be read in the light of *United States v. Rauscher*, 119 U.S. 407, 422–23, 7 S.Ct. 234, 242, 30 L.Ed. 425 (1886), in which the Supreme Court applied the rule of specialty and held that an extraditee can be tried only for the offenses for which he has been delivered by the asylum country. Thus, having been extradited in the instant case for the Louisiana charge, the Franks brothers should not have been held or tried in Texas. The government lacked personal jurisdiction over them and had no right to detain them, they contend, and thus they must be released and their convictions set aside.

■ We find it unnecessary to determine whether they were extradited, deported or just "kicked out" of Mexico because, in any event, their prosecution and convictions for drug offenses in this case do not offend the treaty or the rule of specialty. We therefore hold that there is no merit in the Franks brothers' contention that the district court in Texas lacked jurisdiction to try them.

In *Fiocconi v. Attorney General of United States*, 462 F.2d 475 (2d Cir.1972),[3] the Second Circuit has decided the merits of the issue the Franks brothers present us today. In that case, the appellants Fiocconi and Kella, citizens of France, were indicted in the district of Massachusetts for conspiring to import heroin into the United States. Bench warrants were issued but could not be executed. After the appellants were traced and arrested by Italian authorities, the United States embassy in Rome requested their extradition as a matter of comity between governments.[4] Among the papers submitted to the Italian government were the indictment and the arrest warrants issued by the district court for Massachusetts.

After a hearing, a court in Florence directed the appellants' extradition "so that they [could] be subjected to judgment according to the writ of indictment formulated by the grand jury of the District Court of Appeals of Massachussetts [sic] dated the 20th November, 1969, and according to the consequent order for arrest on the same date." After unsuccessful appellate proceedings, Fiocconi and Kella were delivered in Italy to United States authorities and were removed to Boston on October 6, 1971. They pleaded not guilty.

Soon after their release on bail, Fiocconi and Kella were subpoenaed to appear before a grand jury in the southern district of New York. When they appeared, they were arrested on warrants issued under an indictment returned that day, which charged them with the substantive crime of receiving, concealing, selling and facilitating the transportation, concealment and sale of heroin in the southern district of New York. Fiocconi and Kella petitioned for habeas corpus, and while their petition was pending, the grand jury returned a superseding indictment charging the appellants and twenty-one other defendants with conspiring to violate the narcotics laws and with two subsequent offenses. The district judge denied the petition for habeas corpus.

---

**2.** Article 17 of the treaty reads, "A person extradited under the present treaty shall not be detained, tried or punished in the territory of the requesting party for an offense other than that for which extradition has been granted...."

**3.** There are no Fifth Circuit cases directly on point. In *United States v. Zabaneh*, 837 F.2d 1249 (5th Cir.1988), we considered the question whether an individual has standing to raise extradition treaty violations generally, but we did not focus specifically on whether an individual has standing to raise violations of the rule of specialty. In *Zabaneh* we cited *United States v.*

*Cadena*, 585 F.2d 1252, 1260–61 (5th Cir.1978), for the proposition that where no party to a treaty protests a treaty violation, an individual lacks standing to raise the treaty as a basis for challenging the court's jurisdiction. *Cadena*, however, involves the United Nations Convention on the High Seas.

**4.** The rule of specialty is a general rule of international law which applies with equal force whether extradition occurs by treaty or comity. *Fiocconi v. Attorney General of the United States*, 462 F.2d 475, 479–80 (2d Cir.1972).

The court of appeals, in an opinion written by Chief Judge Friendly, held that where Italy extradicted persons who were indicted in the district court of Massachusetts on a charge of conspiracy to import heroin, and Italy did not make any affirmative protest concerning the narcotics charge made against the extraditees in New York after they were brought to this country pursuant to the grant of extradition, the extraditees were not entitled to be released from the New York charge and that it was not a breach of faith by the United States to make such a charge.

The Second Circuit reasoned that although Fiocconi was extradited on the basis of comity between nations, rather than on the basis of a treaty, the basic principle of specialty is the same in both situations. The purpose of the rule in both cases is to preserve the requesting nation from a breach of faith against the requested nation. "However, the *Rauscher* remedy [of quashing the prosecution] must be applied in light of the considerations that gave it birth. Since the object of the rule was to prevent the United States from violating international obligations, it becomes essential to determine as best one can whether the surrendering state would regard the prosecution at issue as a breach." 462 F.2d at 480. Just as correcting a technical variance in the indictment should not be considered as charging "a separate offense" for purposes of the rule of specialty, *United States v. Paroutian*, 299 F.2d 486, 490–91 (2d Cir.1962), neither should a separate indictment for a crime of the same character as the crime for which the extraditees were initially extradited. 462 F.2d at 481. "'The principle of specialty' reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government, especially for political crimes." *Id.* Judge Friendly found it extremely unlikely that Italy would have objected if a superseding indictment including later narcotics offenses had been filed in Massachusetts. In his view, Italy similarly would have regarded the narcotics charges in New York simply as a technical jurisdictional question

within the United States system, and not as a filing of new charges of the kind the rule of specialty would prohibit. Thus, viewed in the light of the underlying purpose of the *Rauscher* rule, the trial of the extraditees for a separate but similar offense in another jurisdiction would not be an act of bad faith against the requested country such as would constitute a violation of the rule of specialty.

Undeniably, there is a close factual similarity between our case and *Fiocconi;* indeed *Fiocconi* is almost precisely our case. The Franks brothers were indicted in January 1986 in the western district of Louisiana for a conspiracy to import marijuana from Belize and for actual importation of marijuana from Belize, by air. Other members of the conspiracy were indicted for conspiracy to possess with intent to distribute marijuana and for actual possession with intent to distribute marijuana. The nature of the charges alleged in the Louisiana indictment was identical in character to the nature of the charges alleged in the Texas indictment under which the instant prosecution was maintained. Thus, merely applying the *Fiocconi* precedent formalistically, we would conclude that the rule of specialty in Article 17 does not bar the instant prosecution of the Franks brothers.

But the Franks brothers would contend that the Supreme Court trumps the Second Circuit and that notwithstanding whether we are attracted to the *Fiocconi* result, we are bound to follow *Rauscher*. Although no one can doubt the basic truth of this simple maxim, the facial conflict between *Rauscher* and *Fiocconi* can be resolved to our satisfaction. Indeed, Judge Friendly in *Fiocconi* lit our path when he said we must look to the background and the purpose of the *Rauscher* decision. 462 F.2d at 480.

*Rauscher*, which involved an extradition treaty between the United States and Britain, was decided against a backdrop of political controversy over precisely whether the treaty contained a rule of specialty. The controversy arose after the conclusion of the treaty when one Winslow was charged with forgery in the United States. The United States requested the extradi-

tion of Winslow, who had taken refuge in England. Before Britain agreed to relinquish Winslow, the British Foreign Office required a pledge that the United States would not try Winslow on any charge other than the forgery. The United States refused to accede to the British demand, diplomatic negotiations ensued, and the matter was significant enough that the British Foreign Minister, Lord Derby, spoke on the subject in the House of Lords. Thus, although there is no record of a formal British protest of the extradition of Rauscher, the British had made known their very strong feelings through a history of negotiations and deliberations. By contrast, in the instant case, there is absolutely no evidence that the Mexican government objected to the trial of the Franks brothers on drug charges in Texas. Indeed, the Mexicans were apparently only too happy to have the Frankses taken off their hands.

*Rauscher* is distinguishable from the instant case in a second important way. Rauscher was extradited upon a charge of murder on the high seas, but was tried on a charge of inflicting cruel and unusual punishment upon the man of whose murder he was accused. As the *Rauscher* Court observed, the crime of inflicting cruel and unusual punishment is different in kind and degree from the crime of murder, which was the basis upon which Britain had agreed to turn over Rauscher. Furthermore, the crime of inflicting cruel and unusual punishment was not on the list of extraditable offenses in the treaty. *Rauscher*, 119 U.S. at 421, 7 S.Ct. at 241. Here, in contrast, the crimes for which the Franks brothers were tried in Texas were similar in nature to those for which the Frankses were extradited, were crimes recognized by the requested country, and were crimes on the treaty's list of extraditable offenses.

The foregoing distinctions make the holding of *Rauscher* inapplicable to the instant case. Given that the Franks brothers were neither citizens nor residents of Mexico, that they were involved in a criminal enterprise contrary to the laws of Mexico, that the crime for which they were turned over to the United States authorities is of the same nature and character as that involved in the instant prosecution, and that Mexico made no protest whatever to the prosecution of the Franks brothers in Texas, we hold that there is no basis to conclude that Mexico was or had reason to be offended by this prosecution and, hence, this prosecution does not constitute a breach of the treaty provisions.[5]

It follows that the Franks brothers were not entitled to an evidentiary hearing because such a hearing is required only when an applicant for habeas relief alleges facts that, if proved, would entitle him to relief. *Townsend v. Sain*, 372 U.S. 293, 295, 83 S.Ct. 745, 748, 9 L.Ed.2d 770 (1963). Here, even if the Franks brothers had been given an opportunity to prove that they were extradited and could do so, this prosecution would not violate the rule of specialty in article 17 of the treaty. Proof of extradition could serve as the basis neither for habeas relief nor for the Frankses' contention that the district court lacked jurisdiction to try them. Thus, an evidentiary hearing on the alleged fact of extradition is not required, and the district court acted within its discretion when it denied a hearing.

### XIV

For the foregoing reasons, the judgment of convictions of the district court as to each defendant is in all respects,

**AFFIRMED.**

---

5. Because *Fiocconi* controls, we find it unnecessary to address the government's contention that the Franks brothers lack standing to raise the alleged treaty violation as a bar to personal jurisdiction, and the Franks brothers' contention that *Rauscher* gives them standing. *See United States v. Herbage*, 850 F.2d 1463, 1466 (11th Cir.1988); *United States v. Najohn*, 785 F.2d 1420, 1499 (9th Cir.), *cert. denied*, 479 U.S. 1009, 107 S.Ct. 652, 93 L.Ed.2d 707 (1986); *Demjanjuk v. Petrovsky*, 776 F.2d 571 (6th Cir. 1985); *Shapiro v. Ferrandina*, 478 F.2d 894 (2d Cir.1973).