# In the
# United States Court of Appeals
## for the Second Circuit

AUGUST TERM 2015
No. 15-2454-cr

UNITED STATES OF AMERICA,
*Appellee*,

v.

RAFAEL ANTONIO GARAVITO-GARCIA, ALSO KNOWN
AS SEALED DEFENDANT 1, ALSO KNOWN AS EL VIEJO,
*Defendant-Appellant*.[*]

On Appeal from the United States District Court
for the Southern District of New York

ARGUED: JUNE 14, 2016
DECIDED: JULY 1, 2016

Before: NEWMAN, CABRANES, AND CARNEY, *Circuit Judges*.

---

[*] The Clerk of Court is instructed to amend the caption of this appeal as indicated above.

On appeal from the July 22, 2015 judgment of conviction entered against defendant-appellant Rafael Antonio Garavito-Garcia by the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) on counts of narcoterrorism conspiracy, in violation of 21 U.S.C. § 960a (Count One); cocaine-importation conspiracy, in violation of 21 U.S.C. § 963 (Count Two); conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1) and (d)(1) (Count Three); and conspiracy to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. § 2332g (Count Four).

Garavito-Garcia raises four issues on appeal: (1) that the District Court improperly denied his motion to dismiss the indictment for lack of jurisdiction resulting from Colombia's violation of its extradition treaty with the United States; (2) that the evidence at trial was insufficient to prove he knowingly participated in any of the conspiracies with which he was charged; (3) that a supplemental instruction the District Court gave in response to a jury note was improper; and (4) that Count Three of the indictment was "multiplicitous" of Count One. Finding each of these arguments unpersuasive, we **AFFIRM** the District Court's judgment.

———————

ILAN GRAFF (Shane Stansbury & Adam S. Hickey, *on the brief*), Assistant United States Attorneys, *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, NY, for *Appellee.*

ROBERT W. RAY (Justin J. Krane, *on the brief*), Fox Rothschild LLP, New York, NY, for *Defendant-Appellant.*

JOSÉ A. CABRANES, *Circuit Judge*:

Defendant-appellant Rafael Antonio Garavito-Garcia appeals from the July 22, 2015 judgment of conviction entered against him by the United States District Court for the Southern District of New York (Jed S. Rakoff, *Judge*) on counts of narcoterrorism conspiracy, in violation of 21 U.S.C. § 960a (Count One); cocaine-importation conspiracy, in violation of 21 U.S.C. § 963 (Count Two); conspiracy to provide material support to a foreign terrorist organization, namely the *Fuerzas Armadas Revolucionarias de Colombia* (the "FARC"), in violation of 18 U.S.C. §§ 2339B(a)(1) and (d)(1) (Count Three); and conspiracy to acquire and transfer anti-aircraft missiles, in violation of 18 U.S.C. § 2332g (Count Four).

Garavito-Garcia raises four issues on appeal: (1) that the District Court improperly denied his motion to dismiss the indictment for lack of jurisdiction resulting from Colombia's violation of its extradition treaty with the United States; (2) that the evidence at trial was insufficient to prove he knowingly participated in any of the conspiracies with which he was charged; (3) that a supplemental instruction the District Court gave in response to a jury note was improper; and (4) that Count Three of the indictment

was "multiplicitous" of Count One. Finding each of these arguments unpersuasive, we **AFFIRM** the District Court's judgment.

## BACKGROUND

On January 8, 2013, the Government filed a four-count superseding indictment against Garavito-Garcia, which contained the charges described above.[1] The charges stemmed from Garavito-Garcia's participation in a conspiracy "to ship ton-quantities of FARC-owned cocaine across the Atlantic Ocean to Guinea[-]Bissau, and then to store the cocaine in Guinea[-]Bissau before its shipment to other locations, including the United States."[2] Throughout the course of the conspiracy, Garavito-Garcia "interacted with two individuals who purported at all times to be representatives and/or associates of the FARC," but who were actually "confidential sources working for the Drug Enforcement Administration" (the "DEA").[3]

The Government further alleged that Garavito-Garcia "leveraged his connections to senior officials in Guinea[-]Bissau . . . to facilitate . . . the purchase of military-grade weapons by the FARC"[4]—specifically, "an explosive and incendiary rocket and missile that is guided by a system designed to enable the

---

[1] A-21–32.

[2] A-20.

[3] *Id.*

[4] Government's Br. 3; A-20, A-29–32.

4

rocket and missile to seek and proceed toward energy radiated and reflected from an aircraft and toward an image locating an aircraft," as well as other equipment necessary for their use.[5] The senior Bissau-Guinean officials in question included General Antonio Indjai, the commander of Guinea-Bissau's armed forces, and General Indjai's "right-hand man," Captain Julio M'Bali.[6]

Garavito-Garcia was arrested in Colombia on April 5, 2013.[7] Soon thereafter, the Government formally requested his extradition to the United States.[8] The Colombian authorities ordered Garavito-Garcia's extradition on October 28, 2013, but he appealed, "arguing, among other things, that he should not be extradited because he was in poor health."[9] The Colombian authorities confirmed the extradition order on December 26, 2013, but also "instructed the Colombian Attorney General to obtain a medical report on the feasibility of transferring Garavito-Garcia before the Colombian authorities surrendered him."[10] Garavito-Garcia suffered a stroke five days later.[11]

---

[5] A-31–32.

[6] Government's Br. 4–5 (internal quotation marks omitted).

[7] *Id.* at 11–12.

[8] *United States v. Garavito-Garcia*, 90 F. Supp. 3d 288, 289 (S.D.N.Y. 2015).

[9] *Id.*

[10] *Id.*

[11] *Id.*

On February 14, 2014, before any medical report had issued, the Colombian authorities authorized the United States to remove Garavito-Garcia.[12] Less than two weeks later, before Garavito-Garcia had been removed, a Colombian government agency, the National Institute of Legal Medicine and Forensic Science in Colombia (the "National Institute"), provided its opinion that he would have to be transported in a medical aircraft to ensure his safety.[13] Upon receipt of the National Institute's report, the Colombian authorities "suspended" the "availability" of Garavito-Garcia until proper arrangements could be made.[14]

"Notwithstanding the fact that th[is] delay was designed to accommodate his health issues, Garavito-Garcia then challenged his continued detention in Colombia on the ground that he should have been extradited sooner."[15] Garavito-Garcia's challenge was based on Article 511 of Colombia's Criminal Code, which provides that "[t]he requested person will be released unconditionally by the Attorney General, . . . if after a term of thirty (30) days from the day the person was made available to the requesting State, the latter did not move forward with his transfer."[16] The Colombian Attorney General responded to Garavito-Garcia's challenge by explaining that Article

---

[12] *Id.*

[13] *Id.*

[14] *Id.* (internal quotation marks omitted).

[15] *Id.*

[16] A-51.

6

511's time limit had been suspended in accordance with the National Institute's report and the Colombian authorities' confirmation of the extradition order.[17] But Garavito-Garcia continued to press his argument, claiming in an April 2, 2014 letter to the Colombian Attorney General that Article 511 contains "neither explicit[ ] nor implicit[ ]" exceptions.[18] "The Colombian Attorney General was unpersuaded," however, "and Garavito-Garcia remained in detention."[19]

On June 13, 2014, the National Institute issued a new report, in which it informed the Colombian authorities that "the risk of complications would be reasonably low if Garavito-Garcia travelled on a medical airplane with trained personnel," which caused the Colombian authorities to once again make Garavito-Garcia available for extradition to the United States.[20] On July 22, 2014, Garavito-Garcia was transported in this manner to the Southern District of New York, where he stood trial.[21] On March 26, 2015, a jury convicted him on all four counts,[22] and on July 22, 2015, judgment was entered.[23] This timely appeal followed.

---

[17] *Garavito-Garcia*, 90 F. Supp. 2d at 290.

[18] *Id.* (internal quotation marks omitted).

[19] *Id.*

[20] *Id.* (alterations and internal quotation marks omitted).

[21] *Id.*

[22] Government's Br. 2.

[23] A-436.

# DISCUSSION

## I.  Extradition Treaty

We begin with Garavito-Garcia's first argument. "We . . . review *de novo* the district court's legal conclusions, including those . . . involving the interpretation of a treaty."[24]

"[T]he United States and Colombia have had a formal extradition treaty since 1982 . . . ."[25] Article 12(4) of that treaty reads as follows: "If a warrant or order for the extradition of a person sought has been issued by the competent authority and the person is not removed from the territory of the Requested State within such time as may be prescribed by its laws . . . , that person shall be set at liberty . . . ."[26] The Colombian law that "prescribe[s]" "such time" is Article 511 of the Criminal Code. As noted, Article 511 provides that "[t]he requested person will be released unconditionally by the Attorney General, . . . if after a term of thirty (30) days from the day the person was made available to the requesting State, the latter did not move forward with his transfer."[27] Garavito-Garcia argues that, because he was not extradited within 30 days of being made available to the United States, Colombia violated Article 511; and

---

[24] *Peterson v. Islamic Republic of Iran*, 758 F.3d 185, 189 (2d Cir. 2014) (internal quotation marks omitted), *aff'd sub nom. Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016).

[25] *United States v. Suarez*, 791 F.3d 363, 367 (2d Cir. 2015).

[26] A-64–65.

[27] A-51.

because Article 12(4) incorporates Article 511 by reference, Colombia violated the treaty as well.

This argument fails for at least two independent reasons. First, as we have explained, "absent protest or objection by the offended sovereign, a defendant has no standing to raise the violation of international law as an issue. . . . These concerns apply equally [when] a criminal defendant objects . . . based on the interpretation of an extradition treaty . . . ."[28] Here, because "the Government of Colombia [has not] first [made] an official protest,"[29] Garavito-Garcia lacks standing to invoke the extradition treaty as a basis for the dismissal of the indictment.

Garavito-Garcia argues that this principle does not apply to him, because it is only "*in the absence of express language to the contrary*" that treaties "do not create privately enforceable rights," and "[h]ere, there is express and self-executing language *in the Extradition Treaty* itself mandating that the subject of extradition be released within thirty days upon being made available."[30] But in so arguing, Garavito-Garcia conflates two distinct concepts: treaty language "directly benefiting private persons,"[31] which international

---

[28] *Suarez*, 791 F.3d at 367 (alterations and internal quotation marks omitted); *accord United States v. Bout*, 731 F.3d 233, 240 n.6 (2d Cir. 2013).

[29] *Suarez*, 791 F.3d at 367.

[30] Def.'s Reply Br. 14 n.4 (emphases in original) (internal quotation marks omitted) (quoting *Suarez*, 791 F.3d at 367).

[31] *Medellin v. Texas*, 552 U.S. 491, 506 n.3 (2008) (internal quotation marks omitted).

agreements regularly feature; and treaty language indicating "that the intent of the treaty drafters" was that such benefits "could be vindicated" through private enforcement,[32] which is far less common. The extradition treaty at issue in this case may contain language meeting the former description, but Garavito-Garcia has not identified, nor can we locate, language meeting the latter. Standing is therefore lacking.[33]

Second, international comity precludes us from considering Garavito-Garcia's argument, because Colombia has already rejected his contention that Article 511 prevented his extradition.[34] It is well established that, "although courts of the United States have authority to determine . . . whether an accused should be extradited from the United States, . . . our courts cannot second-guess another country's grant of extradition to the United States."[35] Here, in order to find that Colombia violated the extradition treaty, we would necessarily have to disagree with the Colombian Attorney General's determination that no violation of Article 511 occurred. This we may not do. The "deference" we must accord the Colombian Attorney

---

[32] *Suarez*, 791 F.3d at 367 (internal quotation marks omitted).

[33] *See Medellin*, 552 U.S. at 506 n.3 ("Even when treaties are self-executing in the sense that they create federal law, the background presumption is that international agreements, even those directly benefiting private persons, generally do not create private rights or provide for a private cause of action in domestic courts." (alterations and internal quotation marks omitted)).

[34] *See* A-140.

[35] *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002); *accord Bout*, 731 F.3d at 239–40.

General's determination is "essential to the maintenance of cordial international relations. It could hardly promote harmony to request a grant of extradition and then, after extradition is granted, have the requesting nation take the stance that the extraditing nation was wrong to grant the request."[36] For these reasons, we must reject Garavito-Garcia's first argument.

## II. Sufficiency of the Evidence

We turn next to Garavito-Garcia's argument that the evidence at trial was insufficient to prove that he knowingly participated in any of the conspiracies with which he was charged. Specifically, Garavito-Garcia argues that "[t]he record at trial is all but bereft of any indication that [he] assented to, or even expressed interest in, the aspects of the scheme involving weapons or importing narcotics to the United States."[37]

"We review claims of insufficient evidence *de novo*," but "[a] defendant bears a heavy burden in seeking to overturn a conviction on [these] grounds," as we "will affirm if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[38] As concerns Garavito-Garcia's particular insufficiency claim, "[t]he government may prove the defendant's

---

[36] *Campbell*, 300 F.3d at 209.

[37] Def.'s Br. 30–31.

[38] *United States v. Allen*, 788 F.3d 61, 66 (2d Cir. 2015) (internal quotation marks omitted).

knowing participation in a conspiracy through circumstantial evidence," which "may include, for example, a defendant's association with conspirators in furtherance of the conspiracy" or "his presence at critical stages of the conspiracy that cannot be explained by happenstance."[39]

Here, the Government introduced sufficient evidence from which a rational trier of fact could have inferred Garavito-Garcia's knowing participation in those aspects of the scheme that involved weapons and importing narcotics into the United States. For example, with respect to weapons, the Government introduced evidence that, during a November 13, 2012 conversation with Captain M'Bali, Garavito-Garcia explained why the FARC wanted to obtain anti-aircraft missiles:

> [T]he problem, Captain . . . see? [T]he problem is the Americans. The gringos come to our country . . . . to fumigate. . . . They start to fumigate the land so they can't cultivate. . . . They are damaging the soil . . . . Damaging the soil, for many after . . . . Then they turn, . . . turn it into, like, Mauritania, into a desert. There was nothing. The Americans don't care. So these people [(the FARC)] want to show that they have power to send them [(the Americans)] to hell because right

---

[39] *United States v. Anderson*, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks omitted).

now they are talking about making peace with the government. See?[40]

This explanation from Garavito-Garcia took place in the context of an extended discussion about anti-aircraft missiles between Garavito-Garcia, M'Bali, a DEA confidential source, a Colombian narcotics trafficker, and two Bissau-Guinean narcotics traffickers.[41] The discussion is but one example among many instances in which Garavito-Garcia made statements that a rational trier of fact could interpret as evincing his knowing participation in the weapons scheme. To choose just one additional example, Garavito-Garcia had earlier assured General Indjai on July 2, 2012 that, insofar as the potential weapons deal was concerned, the FARC would "[p]ay for everything."[42]

There was also sufficient evidence from which a rational trier of fact could have inferred Garavito-Garcia's knowing participation in the aspect of the scheme that involved importing narcotics into the United States. As the Government correctly points out, a rational trier of fact could have determined "that Garavito-Garcia believed what the [DEA] sources told him, namely, that on the FARC's behalf, they planned to move tons of cocaine into the United States . . . . Knowing this, [Garavito-Garcia] went back and forth across the Atlantic Ocean with the confidential sources, to broker a

---

[40] SA-338–39.

[41] *See* SA-326–53.

[42] SA-166.

13

deal with his contacts in Guinea[-]Bissau."[43] Garavito-Garcia's second argument thus fails to convince.

## III. Supplemental Jury Instruction

Garavito-Garcia's third argument is equally unavailing. He argues that "[t]he district court's initial 'mere presence' jury instruction evidently resulted in confusion amongst the jurors, as reflected in the jury note sent to the district court soon after deliberations had commenced," and that "[t]he district court's supplemental [']mere presence['] instruction . . . failed to address the source of the jury's confusion, that is, whether proof of mere acquiescence was enough."[44]

Garavito-Garcia's argument relates to a note that the jury sent to the District Court during deliberations, which read as follows:

> I would like more clarification on conspiracy charges in general. I am unclear whether someone's presence during a conversation without specific participation is enough to convict someone of those charges. Is the only way that someone could escape such a situation to physically leave the room, or to specifically state their lack of consent to the . . . . topic under discussion? I feel unable to differentiate different situations in which someone is implicated in a conspiracy or not.[45]

---

[43] Government's Br. 32.

[44] Def.'s Br. 34.

[45] A-364.

14

Contrary to Garavito-Garcia's assertion, the District Court addressed the source of the jury's confusion head-on, through a supplemental instruction that was both directly responsive and objectively correct. After reiterating several general conspiracy principles, the District Court instructed the jury as follows:

> Because the burden of proof is always on the Government, a defendant who is present where a conspiratorial agreement is being planned by others does not have any burden to show that he affirmatively denied consent to the agreement or physically left the room when it was being discussed; the burden is always on the Government and mere presence without participation in the unlawful plan is not sufficient to meet that burden.[46]

The District Court thus clearly did not fail to "address the question as to whether or not a person has to physically leave the room in order to escape being considered a conspirator, or whether or not a person has to explicitly state [his or her] lack of consent to the discussion."[47]

## IV.  "Multiplicitous" Counts

Lastly, we consider Garavito-Garcia's argument that Count Three of the indictment (conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. §§ 2339B(a)(1)

---

[46] A-377.

[47] Def.'s Br. 34–35.

15

and (d)(1)) was "multiplicitous" of Count One (narcoterrorism conspiracy, in violation of 21 U.S.C. § 960a), which resulted in duplicative punishment prohibited by the Double Jeopardy Clause of the Fifth Amendment. We conclude that it was not.

The Double Jeopardy Clause provides that "[n]o person shall be subject for the same offence to be twice put in jeopardy of life or limb."[48] This guarantee "prohibits multiple punishments for the same offense."[49] Whether two offenses are in fact the same for Double Jeopardy purposes is determined by reference to the so-called "same-elements" test that the Supreme Court established in *Blockburger v. United States*, 284 U.S. 299 (1932).[50] This test "asks whether each offense contains an element not contained in the other, and provides that, if not, they are the same offen[s]e and double jeopardy bars additional punishment."[51] Critically, "[i]n applying the *Blockburger* test, we are required to focus on the statutory elements of each offense. If each *statute* requires proof of a fact that the other does not, the *Blockburger* test is satisfied, even if the same proof is used at trial to establish both crimes."[52]

---

[48] U.S. CONST. amend. V.

[49] *United States v. Weingarten*, 713 F.3d 704, 708 (2d Cir. 2013).

[50] *See id*.

[51] *Id.* (internal quotation marks omitted).

[52] *United States v. Biasucci*, 786 F.2d 504, 516 (2d Cir. 1986) (emphasis in original) (citations omitted); *accord Thigpen v. Roberts*, 468 U.S. 27, 39 (1984) ("[T]he test focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied,

Here, it is clear that § 960a and § 2339B each require proof of a fact that the other does not. Section 960a requires the Government to prove that the defendant engaged in certain conduct "knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization *that has engaged or engages in terrorist activity* (as defined in section 1182(a)(3)(B) of Title 8) *or terrorism* (as defined in section 2656f(d)(2) of Title 22)."[53] This means that, in every prosecution under § 960a, the Government is required to prove that the person or organization to which the defendant provided a pecuniary benefit has engaged in terrorist activity or terrorism.

But this requirement does not apply to § 2339B, which criminalizes "knowingly provid[ing] material support or resources to *a foreign terrorist organization*, or attempt[ing] or conspir[ing] to do so."[54] For purposes of § 2339B, "the term 'terrorist organization' means an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act."[55] Accordingly, in every prosecution under § 2339B, the Government is required to prove that the foreign terrorist organization to which the defendant provided material support has been designated as such by the

---

notwithstanding a substantial overlap in the proof offered to establish the crimes." (internal quotation marks omitted)).

[53] 21 U.S.C. § 960a(a) (emphasis supplied).

[54] 18 U.S.C. § 2339B(a)(1) (emphasis supplied).

[55] *Id.* § 2339B(g)(6).

Secretary of State.[56] It is not, however, required to prove that the organization has engaged in terrorist activity or terrorism. Indeed, once the Secretary's designation becomes effective, "a defendant in a criminal action . . . shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing."[57]

Additionally, just as § 960a's terrorist-activity-or-terrorism requirement is not required by § 2339B, so too is § 2339B's designation requirement not required by § 960a. In other words, in no prosecution under § 960a is the Government required to prove that the person or organization to which the defendant provided a pecuniary benefit has been designated as a terrorist organization.

Therefore, because § 960a and § 2339B each require proof of a fact that the other does not, duplicative punishment prohibited by the Double Jeopardy Clause of the Fifth Amendment was not imposed on Garavito-Garcia.[58]

---

[56] *See* 8 U.S.C. § 1189; *cf. United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008) ("Section 2339B requires proof that [a defendant] provided material support to an organization designated as a foreign terrorist organization."); *United States v. Ahmed*, 94 F. Supp. 3d 394, 422 (E.D.N.Y. 2015) ("The Government must . . . prove, beyond a reasonable doubt[,] that . . . [the organization to which the defendant provided material support] was designated as [a] 'foreign terrorist organization' . . . .").

[57] 8 U.S.C. § 1189(a)(8).

[58] *Cf. United States v. Mohammed*, 693 F.3d 192, 199 (D.C. Cir. 2012) ("[T]he premise that § 960a is redundant [as to statutes such as § 2339B] is suspect. Congress could have reasonably determined that international drug trafficking

## CONCLUSION

We have considered all of Garavito-Garcia's arguments on appeal and found them to be without merit. The July 22, 2015 judgment of the District Court is therefore **AFFIRMED**.

---

combined with the intent to support a terrorist is a different crime—more blameworthy, more dangerous, or both—than drug trafficking overseas and material support of terrorism committed separately. Or Congress could have decided that the ability to charge one crime instead of two was a valuable, perhaps necessary, tool for prosecutors that warranted creating a new crime. In any event, . . . [r]edundancies across statutes are not unusual events in drafting, and courts must give effect to overlapping statutes unless there is positive repugnancy between them." (internal quotation marks omitted)).