USA v. Barinas

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2016

(Argued:  April 24, 2017                                                          Decided:  July 28, 2017)

Docket No. 16-2218

_____

UNITED STATES OF AMERICA,

*Appellee,*

- v. -

EDUARDO BARINAS,

*Defendant-Appellant.*[*]

_____

Before:  KEARSE, CALABRESI, and CABRANES, *Circuit Judges*.

Appeal from a 2016 judgment of the United States District Court for the Eastern District of New York, I. Leo Glasser, *Judge*, finding that defendant violated conditions of supervised release imposed on him upon his narcotics trafficking conviction in 1997 in the present case, E.D.N.Y. 95-CR-00621 ("*Barinas I*"), and sentencing him to imprisonment for one year and one day, to be served consecutively to the sentence imposed on him in 2016--following his extradition to the United States and conviction on a new narcotics trafficking charge--in *United States v. Barinas*, No. 08-CR-772 (D.N.J. Mar. 28, 2016) ("*Barinas II*").  The district court found that defendant violated

---

[*]     The Clerk of Court is instructed to amend the official caption to conform with the above.

the terms of his supervised release by (1) failing to report to the probation office as directed, (2) leaving, without permission, the district in which he was to be supervised, and (3) committing the crime of which he was convicted in *Barinas II*. On appeal, defendant contends that because he was extradited to the United States specifically to face the charges in *Barinas II*, the district court's adjudication of supervised-release-violation charges contravened the principle of specialty and that, in any event, the narcotics trafficking crime of which he was convicted in *Barinas II* could not properly be the basis for a finding of supervised-release violation because he committed that crime after his term of supervision was scheduled to expire. We conclude that defendant lacks prudential standing to raise a rule-of-specialty challenge and that his other challenge lacks merit because his supervised-release term was tolled while he was a fugitive.

Affirmed.

MICHAEL T. KEILTY, Assistant United States Attorney, Brooklyn, New York (Robert L. Capers, United States Attorney for the Eastern District of New York, Susan Corkery, Assistant United States Attorney, Brooklyn, New York, on the brief), *for Appellee*.

SAMUEL I. JACOBSON, Assistant Federal Defender, Brooklyn, New York (Barry D. Leiwant, Federal Defenders of New York, Inc., Appeals Bureau, New York, New York, on the brief), *for Defendant-Appellant*.

KEARSE, *Circuit Judge*:

Defendant Eduardo Barinas, who in 1997 was convicted in the present case, E.D.N.Y. 95-CR-00621 ("*Barinas I*"), of conspiring to possess with intent to distribute crack cocaine in

violation of 21 U.S.C. § 846 and was sentenced principally to time-served and a five-year term of supervised release, appeals from a June 2016 judgment of the United States District Court for the Eastern District of New York, I. Leo Glasser, *Judge*, revoking his supervised release and sentencing him to imprisonment for one year and one day, to be served consecutively to the sentence imposed on him in 2016--following his extradition to the United States and conviction on new narcotics trafficking charges--in *United States v. Barinas*, No. 08-CR-772 (D.N.J. Mar. 28, 2016) ("*Barinas II*"). The district court found that Barinas had violated the terms of his supervised release by (1) failing to report to the United States Probation Department ("Probation") as directed, (2) leaving, without permission, the district in which he was to be supervised, and (3) committing the crime of which he was convicted in *Barinas II*. On appeal, Barinas contends principally that because he was extradited to the United States specifically to face the *Barinas II* charges, the district court's adjudication of charges of supervised-release violation contravened the principle of specialty, which generally requires a country seeking extradition to adhere to limitations placed on prosecution by the surrendering country, *see*, *e.g.*, *United States v. Suarez*, 791 F.3d 363, 366 (2d Cir. 2015) ("*Suarez*"), *cert. denied*, 136 S. Ct. 800 (2016). He also argues that the narcotics trafficking crime of which he was convicted in *Barinas II* could not properly be the basis for a finding of supervised-release violation because he committed that crime after his term of supervision was scheduled to expire. We conclude that Barinas lacks prudential standing to raise a rule-of-specialty challenge and that his claim that his supervised-release term ended prior to his *Barinas II* crime lacks merit because that term was tolled while he was a fugitive. We thus affirm the judgment.

3

# I. BACKGROUND

The relevant facts are not in dispute. In *Barinas I*, following his plea of guilty, Barinas was convicted of conspiring to possess with intent to distribute narcotics in violation of 21 U.S.C. § 846 and was sentenced in March 1997 principally to time-served and a five-year term of supervised release. As a mandatory condition of supervised release, Barinas was forbidden to commit any further federal or state crime, *see* 18 U.S.C. § 3583(d). The standard conditions of supervised release included the requirements that he report to his Probation officer as directed and that he not leave the judicial district in which he was subject to supervision unless he received permission from his Probation officer or the court.

## A. *The July 1997 Charge of Supervised-Release Violation*

Originally Barinas was to be supervised by the Eastern District of New York ("EDNY") Probation office; after he failed to report to that office, Probation learned that he was living at his sister's apartment in Yonkers, New York, which is within the Southern District of New York ("SDNY"). Accordingly, in April 1997 his immediate supervision was transferred to the SDNY Probation office. Some two months later, however, the SDNY Probation office notified the EDNY Probation office that Barinas had not reported as required since June 13, 1997. Probation then learned from Barinas's sister that Barinas had left her home in mid-June after an argument and had never returned. Probation was unable to determine Barinas's whereabouts.

In July 1997, the EDNY Probation office filed a petition in the district court, describing the above events and charging Barinas with failing to report to Probation as required. (*See* Violation of Supervised Release Report dated July 30, 1997 ("1997 Violation Report").) On August 1, at the EDNY Probation office's request, the court issued a warrant for Barinas's arrest.

Barinas, a citizen of the Dominican Republic and aware of that arrest warrant, left the United States in 1997. (*See* Supplement to the Violation of Supervised Release Report, dated April 13, 2016 ("Supplemental Violation Report" or "2016 Violation Report"), at 2 (citing *Barinas II* presentence report describing Barinas's statements to Probation in the District of New Jersey ("DNJ")).) He did not return until he was extradited from the Dominican Republic in 2013 (*see* Part I.B. below).

B. *Barinas's 2013 Extradition and His 2016 DNJ Conviction*

In late 2007, the United States received information that Barinas was in the Dominican Republic and was conspiring to ship cocaine into the United States. Following assistance from confidential informants, shipments were intercepted, and in 2008 Barinas was indicted by a DNJ grand jury, in *Barinas II*, on three substantive or conspiracy counts with regard to the importation of cocaine into the United States, *see* 21 U.S.C. §§ 952, 960(a)(1), 960(b)(1)(B), 960(b)(2)(B), and 963, and 18 U.S.C. § 2. In 2009, pursuant to a 1909 extradition treaty between the United States and the Dominican Republic, *see* Convention Between the United States and the Dominican Republic for the Extradition of Criminals, June 19, 1909, 36 Stat. 2468 ("1909 Treaty" or "Treaty"), the United States formally requested that the Dominican Republic extradite Barinas to the United States to face those charges (*see* Diplomatic Note No. 268 from the Embassy of the United States of America, Santo

Domingo, to the Secretariat of State for Foreign Relations of the Dominican Republic dated September 3, 2009 ("Diplomatic Note" or "Note")).

The Note stated that Barinas was "wanted to stand trial in the District of New Jersey for narcotics offenses" and listed the three counts alleged in the *Barinas II* indictment (Diplomatic Note at 2), and it recited the basic factual allegations underlying that indictment (*see id*. at 3). An accompanying affidavit by an Assistant United States Attorney summarized the investigation leading to the DNJ indictment. (*See* Affidavit in Support of Request for Extradition dated June 25, 2009.) It included descriptions of (a) statements by Barinas, as reported to law enforcement authorities by a confidential informant in the Dominican Republic ("CI-DR"), that Barinas was planning to ship cocaine from the Dominican Republic to the United States to be received by Barinas's contact in New York (*see id*. ¶¶ 23-25); (b) the cooperation of CI-DR and of another confidential informant in New Jersey ("CI-NJ"), including recorded telephone conversations between CI-NJ and Barinas (*see id*. ¶¶ 23-34); (c) the arrests, following a series of controlled deliveries, of Barinas's New York contact and two other coconspirators (*see id*. ¶¶ 33-39); and (d) the guilty pleas of those three coconspirators (*see id*. ¶ 40). Neither the Diplomatic Note nor the affidavit mentioned the *Barinas I* conviction or the warrant for Barinas's arrest on the charge of violation of supervised release in *Barinas I*.

Barinas was arrested in the Dominican Republic in July 2013 and was extradited to the United States that September. In November 2015, after the filing of a one-count DNJ superseding information, he pleaded guilty to conspiring to import cocaine into the United States in violation of 21 U.S.C. § 963. In March 2016, the *Barinas II* court sentenced Barinas principally to 78 months' imprisonment, to be followed by a three-year term of supervised release.

6

C. *The 2016 Violation Report and 2016 Proceedings in EDNY*

In April 2016, the EDNY Probation office filed its Supplemental Violation Report, adding to the charges asserted in its 1997 Violation Report, based on information that had emerged during the DNJ prosecution. In addition to the original charge of failure to report to Probation, the supplemental report charged Barinas with leaving the judicial district without the permission of the Probation officer or the court by traveling to the Dominican Republic (charge 2), and with committing another crime, *i.e.*, the *Barinas II* narcotics importation conspiracy (charge 3).

Barinas, represented by counsel, promptly moved to dismiss all three supervised-release-violation charges against him. He contended that the government's pursuit of any of those charges, since they were not mentioned in the extradition request, would violate the rule of specialty. He also noted that the second and third charges of supervised-release violation had not even been filed before he was extradited.

The government opposed the motion to dismiss, arguing that only an extraditing sovereign has standing to raise a rule-of-specialty objection. In a reply memorandum, Barinas argued that even without regard to the rule of specialty, charge 3--violating supervised release by committing the *Barinas II* felony--must be dismissed because his supervised-release period had ended prior to the *Barinas II* offense conduct.

After hearing oral argument, the district court denied Barinas's motion to dismiss. (*See* Hearing Transcript, June 9, 2016 ("Tr.").) Citing 18 U.S.C. § 3583(i), it rejected Barinas's contention that the third charged violation impermissibly focused on conduct that occurred after the end of his supervised-release period, stating that "the supervised release is still in existence." (Tr. 10; *see id.* at 9.) And citing precedents of this Court as holding that, "[a]s a matter of international law, the

7

principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests," rather than as a privilege of the defendant (*id*. at 17), the court ruled that Barinas lacked standing to challenge the charges on the ground that they violated the rule of specialty.

Following that decision and the district court's denial of a motion for an adjournment so that Barinas could request a rule-of-specialty objection from the Dominican Republic, Barinas and the government entered into the following stipulation:

> 1.  Eduardo Barinas, the defendant, failed to report to the Probation Department after June 13, 1997;
>
> 2.  Eduardo Barinas, the defendant, traveled to the Dominican Republic after his last time reporting to the Probation Department on June 13, 1997, and did not notify the Court or the Probation Department of hi[s] travel;
>
> 3.  Eduardo Barinas, the defendant, pled guilty on November 18, 2015, to a one-count superseding information in the District of New Jersey, charging that from in or about October 2007 through in or about November 2007, Mr. Barinas conspired to import cocaine into the United States.

(Stipulation dated June 10, 2016, at 1.)  The parties agreed that in signing the stipulation, Barinas did not waive "his right to argue on appeal that the violation of supervised release charges were brought in error, or contrary to any law or treaty."  (*Id*.)

On the basis of the stipulated facts, the district court found all three supervised-release-violation charges established.  The court revoked Barinas's supervised release and sentenced him to imprisonment for one year and one day, to run consecutively to his *Barinas II* sentence.

## II. DISCUSSION

On appeal, Barinas principally pursues his contentions (1) that the EDNY supervised-release-revocation proceedings violated the rule of specialty, and (2) that the district court lacked authority to find a supervised-release violation based on a crime he committed after the scheduled end of his supervised-release term.  Reviewing issues of law and standing *de novo*, *see*, *e.g.*, *United States v. Baez*, 349 F.3d 90, 92 (2d Cir. 2003) ("*Baez*") (*de novo* interpretation of extradition agreement and application of the rule of specialty); *Rajamin v. Deutsche Bank National Trust Co.*, 757 F.3d 79, 84, 86 (2d Cir. 2014) (*de novo* review of application of "prudential standing" rule that "normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves" (internal quotation marks omitted)); *United States v. Harris*, 838 F.3d 98, 103-04 (2d Cir. 2016) (*de novo* review of statutory construction), *cert. denied*, 137 S. Ct. 840 (2017), we reject Barinas's contentions.

### A. *The Rule-of-Specialty Challenge*

Preliminarily, we note that although the United States and the Dominican Republic entered into a new extradition treaty in 2015--and that the arguments presented by the parties in the district court cited that new treaty--Barinas, as described in Part I.B. above, was extradited in 2013 pursuant to the 1909 Treaty, and it is the 1909 Treaty that is applicable here.  While the 2015 treaty supplanted the 1909 Treaty on the 2015 treaty's December 15, 2016 effective date, nothing in the 2015 treaty suggests that its terms affect previously completed extraditions; indeed, the 2015 treaty states that even "*requests pending* upon entry into force [of the 2015 treaty] *shall continue under the*

9

*procedures of the 1909 Treaty* supplemented by Article 6 of [the 2015 t]reaty," Extradition Treaty Between the Government of the United States of America and the Government of the Dominican Republic, art. 21(3), Jan. 12, 2015, T.I.A.S. No. 16-1215, at unnumbered page 14 (emphases added); *see id*. art. 6, at unnumbered page 8 (setting out provisions not relevant here, with regard to punishment).

Under an extradition treaty, the principle of specialty means that an extradited defendant "can only be tried for one of the offences described in th[e] treaty [under which he is extradited], and for the offence with which he is charged in the proceedings for his extradition." *United States v. Rauscher*, 119 U.S. 407, 430 (1886); *see*, *e.g.*, *United States v. Alvarez-Machain*, 504 U.S. 655, 659 (1992); *United States v. Campbell*, 300 F.3d 202, 209 (2d Cir. 2002); *Shapiro v. Ferrandina*, 478 F.2d 894, 905 (2d Cir.) ("*Shapiro*"), *cert. dismissed*, 414 U.S. 884 (1973); *Fiocconi v. Attorney General*, 462 F.2d 475, 478-81 (2d Cir.) ("*Fiocconi*"), *cert. denied*, 409 U.S. 1059 (1972). "'Based on international comity, the principle of specialty generally requires a country seeking extradition to adhere to any limitations placed on prosecution by the surrendering country.'" *Suarez*, 791 F.3d at 366 (quoting *Baez*, 349 F.3d at 92). A country that consents to extradite a person has the right to enforce such limitations. *See*, *e.g.*, *United States v. Garavito-Garcia*, 827 F.3d 242, 246-47 & n.33 (2d Cir. 2016) ("*Garavito*"); *Suarez*, 791 F.3d at 367; *Fiocconi*, 462 F.2d at 479 n.8, 481.

However, "'[a] treaty is primarily a compact between independent nations.'" *Mora v. New York*, 524 F.3d 183, 200 (2d Cir.) ("*Mora*") (quoting *Head Money Cases*, 112 U.S. 580, 598 (1884)), *cert. denied*, 555 U.S. 943 (2008). "[I]nternational treaties establish rights and obligations between States-parties--and generally not between states and individuals, notwithstanding the fact that individuals may benefit because of a treaty's existence." *Mora*, 524 F.3d at 200; *see*, *e.g.*, *Medellín*

10

*v. Texas*, 552 U.S. 491, 506 n.3 (2008) ("[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights'" (quoting 2 *Restatement (Third) of Foreign Relations Law of the United States* § 907 comment *a*, at 395 (1986))); *Garavito*, 827 F.3d at 247 n.33. "If contracting States-parties wish to impose upon themselves legal obligations that extend not only to each other, but to all individual foreign nationals, we would ordinarily expect expression of these obligations to be unambiguous." *Mora*, 524 F.3d at 202.

Accordingly, "[a]s a matter of international law, the principle of specialty has been viewed as a privilege of the asylum state, designed to protect its dignity and interests, rather than a right accruing to the accused." *Shapiro*, 478 F.2d at 906. And because "[t]he provisions in question are designed to protect the sovereignty of states, . . . it is plainly the offended states which must in the first instance determine whether a violation of sovereignty occurred, or requires redress." *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir.), *cert. denied*, 421 U.S. 1001 (1975). Absent an express provision in the agreement between the states, any "'individual rights are only derivative through the states,'" *id*. (quoting *Restatement (Second) of Foreign Relations Law of the United States* § 115 comment *e*, at 364 (1965)); and "absent protest or objection by the offended sovereign, a defendant has no standing to raise the violation of international law," *Garavito*, 827 F.3d at 246 (internal quotation marks omitted); *see*, *e.g.*, *Suarez*, 791 F.3d at 367; *United States v. Reed*, 639 F.2d 896, 902 (2d Cir. 1981).

In sum, while "[t]he 'principle of specialty' reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government," *Fiocconi*, 462 F.2d at 481, that principle can afford "the extraditee"

11

himself a "remedy only if the surrendering government would object, since the underlying substantive wrong, which grows out of international law, is only to the latter," *id*. at 479-80 n.8. An extraditee lacks standing to complain of noncompliance with an extradition treaty unless the "treaty [contains] language indicating 'that the intent of the treaty drafters' was that such benefits 'could be vindicated' through private enforcement." *Garavito*, 827 F.3d at 247 (quoting *Suarez*, 791 F.3d at 367).

In the present case, the 1909 Treaty provides that "No person[] shall be tried for any crime or offence other than that for which he was surrendered." 1909 Treaty, art. IV, 36 Stat. at 2472. It does not state that this provision can be enforced by an individual, and we see no language indicating that the Dominican Republic and the United States intended the Treaty to be enforceable by individual defendants. Thus, under our existing precedents--which we decline Barinas's invitation to overrule--the principle of specialty can be invoked here only by the Dominican Republic, which has not lodged any objection to these proceedings. We conclude that the district court did not err in ruling that Barinas lacks prudential standing to invoke that principle.

B. *The Challenge to Supervised-Release-Violation Charge 3*

Barinas contends that even if his rule-of-specialty challenge is rejected, we should vacate the district court's ruling against him on supervised-release-violation charge 3, *i.e.*, violation of the mandatory condition of supervised release by committing the additional federal crime of which he was convicted in *Barinas II*. The district court ruled that it had authority to adjudicate that charge under § 3583(i), which provides that

> [t]he power of the court to revoke a term of supervised release for violation of a condition of supervised release, and to order the defendant to serve a term of imprisonment . . . , extends beyond the expiration of the term of supervised

12

> release for any period reasonably necessary for the adjudication of matters arising before its expiration if, before its expiration, a warrant or summons has been issued on the basis of an allegation of such a violation,

18 U.S.C. § 3583(i).

Barinas argues that adjudication of charge 3 was beyond the court's authority because his *Barinas II* offense conduct occurred in 2007, after the March 7, 2002 scheduled expiration of his EDNY supervised-release term. (He makes no similar argument with respect to the charge 1 allegation of his failure to report to Probation after June 13, 1997, as to which a warrant for his arrest was issued in August 1997, or with respect to the charge 2 allegation of his absconding from the district of supervision in 1997, *see generally United States v. Edwards*, 834 F.3d 180, 195 (2d Cir. 2016) (if, prior to the expiration of the supervised-release period a warrant or summons has been issued, "§ 3583(i), by its terms, extends the post-expiration power of the court, so as to empower courts to adjudicat[e] relevant matters arising before the expiration of supervision" (internal quotation marks omitted)).) As to charge 3, Barinas contends that his "term of supervision was complete by the time of the alleged [*Barinas II*] conduct" "[a]bsent tolling of the supervised release period during the intervening years." (Barinas brief on appeal at 28, 30 (capitalization omitted).) He urges us to adopt the view of the First Circuit in *United States v. Hernández-Ferrer*, 599 F.3d 63 (1st Cir. 2010) ("*Hernández*"), that there can be no tolling of a supervised-release period on the basis of the defendant's fugitive status (*see* Barinas brief on appeal at 28-29). We decline to do so, finding more persuasive the majority view that tolling is appropriate, *see, e.g., United States v. Buchanan*, 638 F.3d 448, 455 (4th Cir. 2011) ("*Buchanan*"); *United States v. Delamora*, 451 F.3d 977, 978 (9th Cir. 2006), given that the mere "lapse of time . . . does not constitute service of sentence," *Anderson v. Corall*, 263

13

U.S. 193, 196 (1923) ("*Corall*"), and that a defendant is normally not allowed to take advantage of his own misconduct.

Supervised release, as authorized by 18 U.S.C. § 3583, is the "form of postconfinement monitoring[,] overseen by the sentencing court," fashioned by Congress with a view to improving a defendant's odds of progressing successfully from prison life to liberty, by

> "eas[ing] the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or [by] provid[ing] rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release."

*Johnson v. United States*, 529 U.S. 694, 697, 708-09 (2000) (quoting S. Rep. 98-225, at 124 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3307). Some supervised-release conditions, such as the prohibition against committing any further federal or state crime, are mandatory, *see* 18 U.S.C. § 3583(d); some are discretionary but considered "standard" in the sense that they are virtually always imposed, such as the requirements that the defendant regularly report to Probation and that he not leave the supervisory jurisdiction without first obtaining permission from Probation or the court; and others are discretionary and closely tailored to the defendant, his offenses, and his personal circumstances. *See generally* Sentencing Guidelines § 5D1.3. In sum,

> [s]upervised release "is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50, 114 S.Ct. 1259, 127 L.Ed.2d 611 (1994). Rather, it "is a unique method of post-confinement supervision," *Gozlon-Peretz v. United States*, 498 U.S. 395, 407, 111 S.Ct. 840, 112 L.Ed.2d 919 (1991), that "fulfills rehabilitative ends, distinct from those served by incarceration," *United States v. Johnson*, 529 U.S. 53, 59, 120 S.Ct. 1114, 146 L.Ed.2d 39 (2000).

*Buchanan*, 638 F.3d at 451.

14

The court has authority to impose further supervised-release conditions or to revoke supervised release if a defendant fails to comply with the conditions already imposed. *See* 18 U.S.C. § 3583(e). "A violation of the terms of supervised release tends to confirm the judgment that help" in adjusting to life out of prison was needed; "and if any prisoner might profit from the decompression stage of supervised release, no prisoner needs it more than one who has already tried liberty and failed." *Johnson*, 529 U.S. at 709.

While § 3583(i) allows the court, as indicated above, a reasonable time beyond the expiration of the supervised-release period where needed to adjudicate charges that a defendant has violated a condition of his supervised release during the supervised-release period, the statutory provisions do not address the court's authority to adjudicate a charge that the defendant absconded during the supervised-release period and while a fugitive committed a prohibited act after the scheduled end of the period. Barinas suggests simply that such fugitivity is irrelevant, and that when the supervised-release period that was imposed has passed, by rote reference to a calendar, supervised release is at an end. We view that approach as inconsistent both with Congress's goals in requiring supervised release and with the "strong federal policy disfavoring fugitives in analogous circumstances," which is based on "the '[d]eeply rooted' maxim 'that no man may take advantage of his own wrong,'" *Buchanan*, 638 F.3d at 453 n.3 (quoting *Glus v. Brooklyn Eastern District Terminal*, 359 U.S. 231, 232 (1959)). For example, a fugitive is barred from invoking a statute-of-limitations defense. *See* 18 U.S.C. § 3290 ("No statute of limitations shall extend to any person fleeing from justice."). And a defendant who is a fugitive during the pendency of his appeal may have his appeal dismissed to punish him for absconding, *see*, *e.g.*, *Allen v. Georgia*, 166 U.S. 138, 141 (1897), or to deter such escapes by others, *see*, *e.g.*, *Estelle v. Dorrough*, 420 U.S. 534, 537-38 & n.7 (1975), or to

15

deal with other problems caused by a defendant's fugitivity, *see*, *e.g.*, *United States v. Awadalla*, 357 F.3d 243, 245 (2d Cir. 2004); *see generally Ortega-Rodriguez v. United States*, 507 U.S. 234, 239 (1993) ("It has been settled for well over a century that an appellate court may dismiss the appeal of a defendant who is a fugitive from justice during the pendency of his appeal.").

It has also long been established that a defendant who becomes a fugitive is not entitled to credit for the period in which he was in abscondence. *See generally Corall*, 263 U.S. at 196 (an "[e]scape from prison interrupts service, and *the time elapsing between escape and retaking will not be taken into account . . . .*" (emphasis added)). In the context of parole--an ancestor of supervised release--we have ruled that a defendant's parole period is tolled when he is a fugitive, and that

> *tolling a parolee's sentence for the period during which he is in abscondence* does not "extend" or increase the original sentence. It merely incorporates *the common law rule that lapse of time does not constitute service of sentence* and, hence, stops the sentence from running for that period during which the offender, *through some fault of his own*, has failed to serve his sentence.

*Caballery v. United States Parole Commission*, 673 F.2d 43, 46 (2d Cir.) ("*Caballery*") (emphases added), *cert. denied*, 457 U.S. 1136 (1982). *Caballery* involved a provision of the Youth Corrections Act ("YCA") that authorized a youthful offender's early parole, followed by an unconditional discharge "on or before six years from the date of his conviction," 18 U.S.C. § 5017(c) (1982), *repealed by* Comprehensive Crime Control Act of 1984, Pub. L. No. 98-473, § 218(a)(8), 98 Stat. 1837, 2027, and a claim by the defendant that the prescribed six-year period included 14 months during which he had absconded. We rejected his claim that the parole commission's denial of credit for those 14 months pursuant to a recently adopted regulation constituted a violation of the *Ex Post Facto* Clause because the regulation did not constitute a change in the law, given the "well-established common law principle that '[m]ere lapse of time without imprisonment or other restraint contemplated

16

by the law does not constitute service of sentence.'" *Caballery*, 673 F.2d at 46 (quoting *Corall*, 263 U.S. at 196). We saw "not the slightest indication in the statute's language or its legislative history that Congress intended to override this common sense lapse-of-time principle when it enacted the YCA." *Caballery*, 673 F.2d at 46. We also noted that

> [t]he rehabilitative purposes of the YCA quite obviously can only be achieved if the offender undergoes the treatment and supervision contemplated by the Act. Yet, under appellant's interpretation of 18 U.S.C. § 5017(c), a youth offender would be afforded credit for time spent *avoiding* the very supervision which was intended to further the beneficial goals of the YCA .... Such an interpretation is patently unreasonable, and would fly in the face of Congressional intent. There is simply no basis for holding that when Congress specified a six-year period of rehabilitation, including time spent under parole supervision, it intended to credit as part of that period whatever time the youth offender could spend eluding parole authorities.

*Caballery*, 673 F.2d at 45-46 (emphasis in original).

The same reasoning applies to a defendant's abscondence from supervised release. For example, in *Buchanan*, the Fourth Circuit described similar cases in which it had concluded that a defendant cannot "obtain credit against the [probation] period for any period of time during which he was not, in fact, under probationary supervision by virtue of his own wrongful act"--a view that paralleled the general principle that "when the service of a sentence is *interrupted by conduct of the defendant* the time spent out of custody on his sentence is not counted as time served thereon." 638 F.3d at 452 (internal quotation marks omitted) (emphasis added).

The *Buchanan* Court applied these traditional principles in the context of fugitives from supervised release and concluded that

> [w]hen a defendant absconds while on supervised release, his absence precludes the sentencing court from exercising supervision over him. Tolling is necessary in that instance to ensure that, upon being apprehended, the defendant will be subject to judicial supervision for a complete term.

17

> However, that does not mean that a defendant who has absconded thereby nullifies the terms and conditions of the supervised release order during his flight. Rather, the terms and conditions remain in effect, and the fugitive-defendant is not at liberty to embark on a "holiday" from them. To the extent that this result may seem harsh, it is the defendant's own misconduct which creates it.

*Id*. at 458. *Accord United States v. Delamora*, 451 F.3d at 978.

We agree. While we do not read § 3583(i) itself as authorizing the tolling of the supervised-release period based on the defendant's fugitive status, we conclude that such tolling is consistent with the traditional principle that an absconder should not benefit from his fugitivity and is consistent with Congress's sentencing scheme of supervision to facilitate the defendant's transition to a law-abiding life in free society.

Although the First Circuit in *Hernández* concluded that the courts lack authority to rule that a period of supervised release has been tolled by the defendant's fugitive status, *see* 599 F.3d at 67-70, based largely on the fact that another statutory section provides that "[a] term of supervised release does not run during any period in which the person is *imprisoned*" for another crime for 30 or more consecutive days, 18 U.S.C. § 3624(e) (emphasis added), we are unpersuaded. We do not interpret § 3624(e)'s provision for the tolling of supervised release when the defendant is "imprisoned" as evincing congressional intent that a defendant who absconded from supervised release should be treated as having performed his supervised-release obligations during the period in which he was a fugitive. *Accord Buchanan*, 638 F.3d at 455-57; *United States v. Murguia-Oliveros*, 421 F.3d 951, 953 (9th Cir. 2005), *cert. denied*, 546 U.S. 1125 (2006). Such treatment would impede achievement of Congress's stated goals for supervised release. And we typically expect a clearer expression of an

18

intention to override such longstanding precepts as the principle that a fugitive should not profit by his unlawful or contumacious conduct.

We note in addition that even if we were to adopt the First Circuit's views, its ultimate position would afford Barinas little consolation. While *Hernández* disapproved of tolling, it nonetheless concluded that the "fact that [a post-supervised-release-period] crime cannot itself be deemed a supervised release violation *does not mean that it is immaterial*," for "as long as a warrant or summons issues before the expiration of the [supervised-release] term" the defendant's post-supervised-release-period "*conduct while a fugitive will be considered at sentencing*," 599 F.3d at 69 (emphases added).

Finally, Barinas's suggestion that this Court's decision in *United States v. Balogun*, 146 F.3d 141, 142 (2d Cir. 1998), requires disapproval of tolling is meritless. In that case, we ruled that the district court could not properly impose a condition that the defendant's supervised release be suspended upon his deportation and reinstated if he reentered the United States within 20 years. That is a far cry from the circumstances here in which Barinas was to remain in the United States for supervision and instead fled, in violation of the conditions imposed on him. As *Buchanan* noted, "the fugitive-defendant's absence arises from his own misconduct. The same cannot be said about a defendant who has been removed from the country by government order." 638 F.3d at 457.

Barinas's contention that the court was required to give him credit for the period in which he became a fugitive and escaped supervision would be antithetical to the congressional authorization for, and goals of, supervision. We conclude that the district court did not err in adjudicating supervised-release-violation charge 3, Barinas's commission of the *Barinas II* crime while he was a fugitive from supervised release.

19

## CONCLUSION

We have considered all of Barinas's arguments on this appeal and have found in them no basis for reversal.  The judgment of the district court is affirmed.